THE KANSAS PACIFIC RAILWAY COMPANY v. EDWIN WHIPPLE, *an infant, by his next friend, Frank B. Whipple.*

1. RAILROAD COMPANY—*Injury to Person on Track—Denial of Question for Defense, Error.* In an action against a railroad company for recklessly and wantonly injuring a little boy nine years of age, who was on the track and was run over by one of defendant's engines, it was error not to allow defendant to ask a witness who was the fireman on the engine and had testified to all the facts, whether the boy had ample time to get off the track after the engineer blew his danger whistle before he was struck by the engine.

K. P. Rly. Co. v. Whipple.

2. ———— *Contributory Negligence.* The fact that one has carelessly put himself in a place of danger is generally not an excuse for another to recklessly or wantonly injure him.

3. Company, *When Liable for Injury.* Where a little boy nine years of age was wrongfully walking upon the track of a railroad company, and his presence was discovered in ample time to prevent his being injured, the company owed to him the duty not to recklessly or wantonly run over him after his situation was perceived. In such a case, the liability of the company must be measured by the conduct of its employés on the train or engine after they became aware of the boy's presence upon the track. After his presence was discovered, if the engineer recklessly or wantonly ran the train or engine upon him, without doing what he reasonably could to stop and avoid the injury, the company is liable.

4. Contributory Negligence; *Rule as to Adult—as to Infant.* The rule of law in regard to the negligence of an adult, and the rule in regard to that of an infant of tender years, are quite different. By the adult there must be given that care and attention for his own protection that is ordinarily exercised by persons of intelligence and discretion. If he fails to give it, his injury is the result of his own folly and cannot be visited upon another. Of an infant of tender years less discretion is required, and the degree depends upon his age and apparent knowledge.

*Error from Douglas District Court.*

ACTION to recover damages for bodily injuries. Judgment for the plaintiff *Whipple* for $7,500 and costs, at the May term, 1886. The defendant *Railway Company* brings the case to this court. The facts are fully stated in the opinion.

*J. P. Usher, A. L. Williams,* and *Chas. Monroe,* for plaintiff in error.

*Byron Sherry,* and *Thomas P. Fenlon,* for defendant in error.

The opinion of the court was delivered by

HORTON, C. J.: This was an action brought by Edwin Whipple, an infant, by his next friend, Frank B. Whipple, against the Kansas Pacific Railway Company, for damages alleged to have been caused by running an engine carelessly, recklessly and wantonly over and upon him. His arm was mashed, his leg crushed, and his head badly cut. His arm

was subsequently amputated. The action was tried before the court and a jury. Judgment was rendered in favor of the plaintiff and against the defendant for the sum of $7,500 and costs. The defendant brings the case to this court, and asks for a reversal of the judgment.

The facts of the case as found by the jury are as follows: Edwin Whipple, at the time of his injuries—August 2, 1879 —was in his ninth year, and deaf and dumb; he lived with his parents in the east part of North Lawrence; his father was a shoemaker, and had resided at the same place in North Lawrence for about twelve years; his shop was nearly opposite the railroad depot; on the morning of August 2, about nine o'clock, Edwin and his mother stopped in his father's shop to rest on their way home; he went from his father's shop along the sidewalk on Locust street as far as the L. L. & G. crossing, in charge of his mother; then, at his mother's direction, he went into Dicker's store after candy; from there he went upon the track of the railroad and followed his mother down the track; his mother directed and expected him to follow her, but did not mention any track upon which he was to go; after Edwin came upon the railroad he passed along between the rails for some distance before he was struck by the engine; he could have seen the engine approaching him from behind if he had looked; a short time before he was run over, Mr. Tudhope, having authority from the railroad company, directed Kennedy, an engineer operating a locomotive, to take Mr. Mallison, one of the company's employés, to his home east of the depot, near Bismarck, upon the engine; the engine was then standing on the first side track south of the main track in the yard of the railroad company, a short distance east of the depot; the engineer ran his engine and tender west over the switch at the depot platform so as to get on the main track, and then started east on the track toward Bismarck; he stopped his engine opposite or near the carpenter shop of the railroad company, and took Mallison on board, and then started toward Bismarck; the engine was moving backward, the tender being in front, as it proceeded east on the main

track; it was seven hundred and ninety-six feet from the place where Mallison got on the engine to Main street, or Dicker's crossing; the boy was struck by the engine seven hundred and sixty-nine feet from the Main street crossing, but there was no street-crossing at the place; the bell of the engine was rung at starting, but ceased at some point between the carpenter shop and Dicker's crossing; the whistle was sounded upon the engine about forty-five or fifty feet from the boy before he was struck; neither the engineer nor anybody else on the engine knew who the boy was that they were approaching on the track, nor did they know that the boy was deaf; the engine was running at the rate of twelve miles an hour; the engineer shut off the steam on the engine at or near the Main street crossing; the plaintiff's mother knew that engines and trains were frequently passing along the railroad where her boy was struck; there was a traveled way for teams and wagons along the south side of the track where the boy was struck, where he could have walked without being between the rails; there was also a path along the side of the track where the boy could have walked without going between the rails; there was also one or more traveled streets by which the boy and his mother could have gone from Dicker's store to his home without passing upon the track at all; the boy, by reason of his deafness, was unfit to pass along the railroad tracks, or to be in places of danger unattended; his mother was aware that on account of his infirmities he was unfitted to be in places of danger; in the discharge of her parental duty, it was the duty of the mother to attend and see that her boy was not exposed to danger, and that he should not go by himself in places of danger.

The jury also returned the following special findings of fact:

"Could the injury to the plaintiff have been avoided by the exercise of reasonable care upon the part of the employés, considering all the surrounding circumstances? Yes.

"Was not the injury inflicted by and through the reckless and wanton neglect of the employés in charge of the engine? Yes.

"Were such warnings given by the employés of defendant on the engine as would have enabled plaintiff to have known of the approach of the engine in time for him to have left the track, if he had not been deaf? No, not one of his years and discretion.

"Did not the engineer, as soon as he suspected and apprehended that the plaintiff did not or would not heed the signals, reverse his engine and attempt to stop it? His signal was not given in time to ascertain the intention of the plaintiff."

On the part of the plaintiff, the testimony of Jones, Evans and Titus was to the effect that the engine which struck the boy was going from twenty to twenty-five miles an hour, and that no bell was sounded, or whistle blown.

The testimony of Kennedy, the engineer, was:

"I first saw a boy walking on the track a little east of the tool-house; the tool-house is two hundred or two hundred and fifty feet east of the crossing of Main street, which is the street that goes by Dicker's store; I was at the Main street crossing when I first saw the boy; the bell was ringing all the time from the time we started from the carpenter shop; when I was within about one hundred and fifty feet of the boy, I sounded the whistle, giving four or five successive blasts; as I got nearer to him — say from thirty to forty feet — I was afraid he was not going to get off the track, and whistled again, and at the same time reversed the engine; it usually takes three motions to reverse the engine, but in this case it took but two motions only, as I had shut off the steam about the Main street crossing, and the two motions were made in an instant; the speed of the engine was about six miles an hour before I shut off steam; after that it gradually decreased until I reversed the engine, but it would not decrease very much in that distance; after I reversed the engine it went about one hundred feet before it stopped; as soon as it stopped I got off the engine and went to the boy; he was lying on the track about ten feet west of the engine; that is, the tender and engine had gone over him and passed ten feet beyond; I should think that the engine and tender were fifty feet long; of course, if I had known the boy was deaf, I could have stopped the engine after I saw him, but I did not know the boy, nor know he was deaf and dumb; I thought he was large enough to understand the signals; until I whistled the second time and reversed the engine, I had no reason to suppose that he did

not hear the first whistle and the bell, and thought that he intended to stay on the track until the engine got most to him and then jump off, as boys of his size had frequently done before along that track."

The testimony of Mallison was:

"After the engine came down and stopped, I got on, and Mr. Tudhope gave the engineer orders to take me home; we went leisurely along about six miles an hour; I was standing partly on the engine and partly on the tender, with my face towards Bismarck; as we were passing down we saw a boy on the track about five hundred feet ahead of us; the bell was rung for the crossing and rung until we got over the crossing; I think we rung the bell at the crossing the second time, and blew the whistle; I supposed the boy would get off the track; I did not know him; judging him as he appeared to me while standing on the engine, he was of sufficient size to apprehend danger signals; I heard the whistle; Kennedy blew the whistle near the boy when he saw the boy was not going to get off; he blew several whistles in succession sharply; we were from two hundred and fifty to three hundred feet from the boy when the whistle was blown; the engineer reversed the engine when he saw the boy was not going to get off; by throwing the engine over he arrested its passage; it stopped after going over the boy; it passed over him about ten feet; and I think we were from two hundred to two hundred and fifty feet from the boy when I observed the engineer reversing the engine."

The testimony of William Dillon was:

"I was the fireman on the engine that ran over the boy; Mallison about opposite the carpenter shop came along with his carpet satchel, and after we had fixed the cars and he said he was ready to go, he got on and I rung the bell and we started; I attended to ringing the bell and to minding the street-crossings; I let go the bell-rope to attend to the fire, and Kennedy sounded the whistle, for then there were several going along the track; we noticed the boy some distance ahead, some two or three hundred yards; we run on down; we whistled for the boy and rung the bell; he did not seem to pay any attention, and so we tried to stop the engine, but before we could stop it ran over the boy; the engine was about at the crossing when we saw the boy, about six hundred feet or a little more; the engineer whistled for the crossing; after he passed the crossing he gave three whistles; they were dan-

ger whistles; I think the engine was making between eight and ten miles an hour, and we were about forty or fifty feet from the boy when the danger signals were sounded."

The following questions were asked by the defendant of Dillon:

"*Ques.:* Were these whistles danger whistles? *Ans.:* They were; yes, sir; that is what they are called.

"Q. Was there time after giving these last whistles for the boy to get off the track? [Objected to by plaintiff as incompetent, irrelevant, and immaterial; objection sustained, and defendant excepted.]

"Q. You don't recollect where he was when he reversed his engine? A. No, sir.

"Q. Was it after he blew his danger whistle? A. Yes, sir.

"Q. And that was ample time for the boy to get off if he had heard you?" [Objected to by plaintiff as incompetent, irrelevant, and immaterial; objection sustained, and defendant excepting.]

The evidence was not only admissible, but important. It was therefore error not to allow the defendant to ask witness the questions objected to. The careless, reckless and wanton conduct of the defendant in running its engine and tender over the track where the boy was injured, as specially alleged in the petition, was the "rate of speed of the engine at twenty miles an hour, without giving any notice or warning, by the ringing of the bell, or blowing the whistle, or otherwise, of its approach, whilst the back of the plaintiff was toward the engine." For some reason the jury disregarded most of the evidence of the plaintiff, and also most of the evidence of the defendant, as to the rate of speed of the engine and tender; and also as to the place where the bell was rung and the whistle sounded. Instead of finding that the engine was going at a speed of twenty to twenty-five miles an hour, as testified to by Jones, Evans and Titus, or from six to eight miles an hour, as testified to by Kennedy and Mallison, they made the finding that the speed of the engine was ten or twelve miles per hour. Again, instead of finding that no bell was rung or whistle sounded, as

1. Error not to allow question for defense.

testified to by Jones, Evans and Titus, they found the bell was rung at the starting of the engine, but ceased at some point before it reached Dicker's crossing; and that the whistle upon the engine was sounded about forty-five or fifty feet from the boy before he was struck. The testimony of Dillon was that the engine was running upon the track from eight to ten miles per hour; and that the engine was about forty or fifty feet from the boy when the danger signals were sounded. The jury accepted his testimony as the more truthful account of the transaction than that of the others. At least, the finding of the speed of the train and the place where the whistle was blown are more in accordance with his testimony than that of the other witnesses. Having given such a preference to Dillon as to the correctness of his testimony, the refusal to permit the witness to answer the questions asked and objected to is the more serious because the jury specially found that the signals of the engineer were not given in time.

In the case of *Quinn v. Railroad Co.*, 12 Atl. Rep. 97, a somewhat similar question was ruled upon. Loomis, J., speaking for the court in that case, said:

"Assuming that the answer involved an opinion, it was clearly admissible; for in the time required for such sudden movements as are referred to, it would be impossible to estimate in minutes or seconds with any approximation to accuracy; but every observer familiar with the running of trains and hand-cars, as this witness was, would carry in his mind, though unconsciously, the measure of time required for jumping from the car as compared with the time it took the train, after it was discovered, to reach the place of collision. In strictness, we doubt whether such evidence should be considered matter of opinion. It would seem to be rather matter of fact, discernible by judgment or estimate. If the mental process be analyzed, it would seem to involve just as much a matter of opinion, had the question been how long it would have taken to jump from the hand-car, and how long it took for the train, after its discovery, to reach the place of the accident."

(See also *The State v. Folwell*, 14 Kas. 105; *City of Parsons v. Lindsay*, 26 id. 426.)

The court had previously admitted testimony similar to that objected to as to a signal one hundred and fifty feet from the boy; and it was more important to admit such testimony where the signal was not given until the engine was within forty or fifty feet of the boy.

Further, as we read the instructions, they contain much surplusage, and were therefore misleading and confusing.

All the facts in this case are embraced in a narrow, very narrow compass. The petition alleged that the defendant "did recklessly and wantonly run upon the little boy and injure him." No liability is charged or claimed against the defendant in consequence of common or ordinary negligence. The plaintiff was not entitled to recover, and cannot recover unless he was recklessly or wantonly run over. The negligence of the mother has nothing whatever to do with the case. If she had fastened her little boy upon the track, instead of leaving him unattended; and if his presence there was known to the engineer upon the engine, he would have had no right to recklessly or wantonly run over him. It is admitted that the boy was walking upon the railroad track in the yard of the defendant, and was injured at a place where there was no public crossing. It is also admitted by the defendant that its employés upon the engine saw the boy upon the track as the engine was about crossing Main street; this was seven hundred and sixty-nine feet from where the boy was struck. Conceding that the plaintiff was wrongfully upon the track, and that no duty arose in his favor until his presence was discovered, nevertheless, the defendant owed to him the duty not to recklessly or wantonly run over him after his situation was perceived. The liability of the defendant must therefore be measured by the conduct of its employés on the engine after they became aware of the boy's presence upon the track. It is not claimed that they failed to discover him. After his presence was discovered, if the engineer recklessly or wantonly ran the train upon him, without doing what he reasonably could to stop and avoid the injury, the defendant is liable. As the engineer exercised control over the movements

*2. Contributory negligence; duty of company.*

*3. Company, when liable for injury.*

of the engine, it was incumbent upon him, after he saw the boy upon the track ahead of the engine, to use reasonable care to avoid doing him any injury. The fact that one has carelessly put himself in a place of danger, is never an excuse for another recklessly or wantonly injuring him. ( *K. C. Rly. Co. v. Fitzsimmons,* 22 Kas. 686; *K. C. Ft. S. & G. Rld. Co. v. Kelly,* 36 id. 655; *U. P. Rly. Co. v. Dunden,* 37 id. 1; *Morris v. Railroad Co.,* 45 Iowa, 29; *Railway Co. v. Monday,* 4 S. W. Rep. 782; *Bouwmeester v. Rld. Co.,* [Mich.,] 34 N. W. Rep. 414; Cooley on Torts, 674.)

This case should have been tried, and upon another trial must be tried, upon the part of the plaintiff, as if the boy was not deaf and had not lost his power of speech, because it is clearly shown that the defendant and all of its employés upon the engine had no knowledge or notice of the infirmities of the boy until after he was struck. If in this case the plaintiff were an adult we might perhaps say as a matter of law, upon the facts disclosed upon the trial, that he could not recover. (*Mason v. Mo. Pac. Rly. Co.,* 27 Kas. 83; *U. P. Rly. Co. v. Adams,* 33 id. 427; *Clark v. Mo. Pac. Rly. Co.* 35 id. 350; *Finlayson v. Railroad Co.,* 1 Dill. C. C. R. 579.) But the party injured was not an adult; he was only a little boy, in his ninth year of age.

"The rule of law in regard to the negligence of an adult, and the rule in regard to that of an infant of tender years, are

4. Contributory negligence; rule as to adult —as to infant.

quite different. By the adult there must be given that care and attention for his own protection that is ordinarily exercised by persons of intelligence and discretion. If he fails to give it, his injury is the result of his own folly, and cannot be visited upon another. Of an infant of tender years less discretion is required, and the degree depends upon his age and apparent knowledge. Of a child of three years of age less caution would be required than of one of seven, and of a child of seven less than one of twelve." (*Rld. Co. v. Gladmon,* 32 U. S. 402.)

As the engineer knew of the presence of the boy upon the track as the engine was about crossing Main street, and as he must have known when he saw him that he was a boy of

tender age and not so capable of taking care of himself as an older person or an adult, he should have brought to bear, for the safety of the boy and his undeveloped judgment, the exercise of adult judgment and caution to prevent his being run over. If the boy had not been seen by the engineer upon the track, or if he had been seen too late to avert the accident, then an entirely different question would be presented for our determination.

Counsel for defendant contend that the words "carelessly, recklessly and wantonly," alleged in the petition, are not words synonomous with "purposely and willfully;" therefore that the plaintiff in his pleading intended to charge the defendant with negligence only; and that the plaintiff cannot recover, because of his contributory negligence. They insist that unless the defendant purposely or willfully ran upon the plaintiff with its engine, plaintiff cannot recover, because he voluntarily exposed himself upon the track in a place of danger. There is a distinction between ordinary negligence and recklessness, or wantonness, as defined in our decisions. A party may recover for the reckless or wanton conduct of another, or as we have said, "for gross negligence amounting to wantonness," without a formal and direct intention to injure any particular person. Mr. Bishop says:

"There is little distinction, except in degree, between positive will to do wrong, and an indifference whether wrong is done or not. Therefore, carelessness is criminal, and within limits, supplies the place of direct intent." (1 Crim. Law, 20.)

Judge Cooley says:

"Where the conduct of the defendant is wanton and willful, or where it indicates that degree of indifference to the rights of others which may justly be characterized as recklessness, the doctrine of contributory negligence has no place whatever, and the defendant is responsible for the injury he inflicts, irrespective of the fault which placed the plaintiff in the way of such injury." (Law of Torts, 674.)

Mr. Pierce says:

"A railroad company has no right to inflict *wanton* injury on persons who are unlawfully on its location, and, where life

and limb are concerned, that injury may well be treated as wanton, subjecting the company to damages, when, although able to do so, it neglects to arrest the engine, which it has good reason to believe will, without an effort to stop it, result in injury to the wrongdoer. A wrongdoer is not necessarily an outlaw as to his property; still less as to his person." (On Railroads, 330.)

Recklessness "is an indifference whether wrong is done or not — an indifference to the rights of others." Wantonness "is reckless sport, willfully unrestrained action, running immoderately into excess."

"Whoever exercises slight care, and no more, is guilty of ordinary negligence; whoever exercises less than slight care, is guilty of gross negligence, and may be guilty of willful and wanton wrongs." (*U. P. Rly. Co. v. Rollins*, 5 Kas. 167.)

In popular use and by our decisions "recklessness" and "wantonness" are stronger terms than mere or ordinary negligence; and therefore, if a person recklessly or wantonly injures another, such person may be subject to damages, even if the other party has been guilty of some negligence, or is a trespasser. In Pierce on Railroads, *supra*, it is said:

"A person entering without right on a railroad company's track, does so at his peril, and cannot recover for injuries suffered by him in a collision with its engines, except when it inflicts them intentionally or *wantonly*."

In *Bouwmeester v. Rld. Co.*, (Mich.,) 34 N. W. Rep., *supra*, the opinion, referring to a former case, uses the following language: "That case was decided expressly upon the ground that the engineer, knowing that the whistles and bells were not sufficient to warn Brandel of his danger, and being able to stop his train before reaching him, ran recklessly and heedlessly upon him. In such case the contributory negligence of the deceased would not avail against the criminal conduct of the engineer."

In *M. K. & T. Rld. Co. v. Weaver*, 16 Kas. 456, Mr. Justice BREWER said in the opinion: "The expulsion may have been wrongful, but it does not seem to have been *wanton*."

In *K. P. Rly. Co. v. Kessler*, 18 Kas. 523, the same judge

in the opinion said: "There was such gross negligence on the part of the railway company, such *wanton* and *reckless* disregard of the rights of the defendant, as to justify mulcting it in the damages allowed."

In *Mason v. Mo. Pac. Rly. Co.*, supra, the railway company was not guilty of gross or *wanton negligence;* and this court said that the plaintiff in that case could not recover, because the negligence of the company did not amount to *wantonness.* See also *Palmer v. Rld. Co.*, (Ind.,) 14 N. E. Rep. 70, for comments upon willful, reckless and wanton acts.

There are various other matters discussed in the briefs, but it is unnecessary to deal with them.

The judgment of the district court will be reversed.

All the Justices concurring.