LEE E. WEEKS, ADMINISTRATOR, ETC., RESPONDENT, v. ATCHISON, TOPEKA AND SANTA FE RAILWAY COMPANY, APPELLANT.—109 S. W. (2d) 374.

Kansas City Court of Appeals. October 15, 1937.

430

*Kennard & Gresham, F. M. Kennard* and *Walter J. Gresham* for respondent.

*Cyrus Crane, George J. Mersereau, John N. Monteith, James F. Walsh* and *Dean Wood* for appellant.

SPERRY, C.—This is an action for the wrongful death of one Floyd Snorgrass, brought by the administrator of the estate of the deceased. There was a verdict and judgment in favor of plaintiff in the sum of $1000. Defendant has appealed.

The facts show that deceased, Floyd Snorgrass, was killed about 8:45 P. M. of December 24, 1935, in Kansas City, Kansas, by one of defendant's engines, being operated westerly over one of its track. The engine, a passenger locomotive, had just come from the Union Station in Kansas City, Missouri, and was going to defendant's roundhouse in that part of Kansas City, Kansas, known as Argentine, to be stored. Defendant had a number of tracks running east and west at the point where deceased was struck. There are four main line tracks at that place numbered one to four, beginning at the south and going toward the north. Track Number One is the eastbound passenger track, track Number Two is the westbound passenger track, track Number Three is the eastbound freight track, and track number Four is the westbound freight track. North of these tracks are several switch tracks, referred to as transfer or classification tracks where freight trains are made and broken up and transfers made to and from connecting lines. The main line and switch tracks lay between Metropolitan Avenue, which is at the foot of a bluff to the south, and the Kaw River on the north, and occupy an area of about

175 feet in width. Over these tracks trains were constantly passing back and forth two or more minutes apart.

Just west of the abandoned Fifth Street Bridge, which is about 245 feet west of the point of the collision, and south of the tracks, is a tower about 124 feet in height, referred to as a "flood light" tower, having a number of strong lights thereon with reflectors throwing light toward the east. These lights lighted the track for several thousand feet east and evidently gave a very bright light where deceased was killed, although one of plaintiff's witnesses testified that one could not read a newspaper there.

Deceased and his brother, John Snorgrass, had fishing lines in the Kaw River near the point where deceased was killed and were going to these lines at that time. They lived on the high bluff to the south of the tracks. In going toward the fishing lines they followed a path which led down the hillside on to the tracks. When they reached the bottom of the hill they stepped over the first main line track and paused between that track and track Number Two on account of a long freight train slowly passing toward the east on track Number Three. They were waiting for this train to pass by, the rear of the same being only five or six cars away. Deceased stood at about the end of the ties of track Number Two, which was about 18 inches south of the rail. His brother stood further away from the track and about four or five feet east of him. Both of them continued to look in both directions for the possible approach of trains on track Number Two, and saw none. However, when John Snorgrass last looked toward the east he saw, about four feet from him, a large locomotive running "light," or without any cars attached, coming from the east at a rate of speed of between 40 and 50 miles per hour. It was without a light and gave no signal of its approach. It missed John Snorgrass but struck deceased, resulting in his death. As the locomotive passed either the engineer or the fireman shouted "look out."

One of the contested issues at the trial was whether deceased was a trespasser on defendant's premises. Defendant admits that there was evidence tending to show the existence of a well-defined path coming down the hill and leading up to the track opposite the point where deceased was killed, but insists that there was no path across the tracks; that the evidence shows that people coming down that path and others would pass over the tracks, without regard to paths or walkways because there were none present. Photographs which were introduced in evidence, plaintiff insists, show that the path upon which deceased descended the hill extended over and across the railroad tracks. Defendant insists that these photographs do not show such a path.

It is difficult for us, in looking at the photographs, to determine whether the path extended across the tracks. There is no question

but that the photographs show a well-worn dirt path coming down the hill with brush and weeds on both sides of the same. The photographs further show that the path leads to the south rail of the most southerly track. The tracks were laid upon cinders and it might well be that a photograph would not disclose the path across the cinders, even if one were there. At any rate, the path leads right up to the railroad and there was oral testimony, on behalf of the plaintiff, that it led across all of the rails of the tracks and down past a switch shanty next to the river. Regardless of what the photographs may show or fail to show, the jury was at liberty to believe the oral testimony that the path extended across the tracks.

It was defendant's theory, at the trial that all of these tracks constituted a switch yard; that there was no well-defined path crossing the same but that there were many paths coming down the hillside toward the tracks; that people using them would spread out and across the tracks at any place that they saw fit, without any definite crossing. There was testimony that there were other paths in the vicinity. However, plaintiff's testimony shows that there were only three paths, one of which was located west of the abandoned Fifth Street Bridge. This bridge was about 245 feet west of where deceased was killed and not in the vicinity. The second path was between the bridge and where deceased was killed but this path had been washed out and was not being used.

The testimony shows that during both the daytime and nighttime a large number of people used the path coming down the hill and crossing the tracks which deceased and his brother were using when the former was killed. These people consisted of fishermen, boat owners, swimmers and pleasure seekers of various kinds. Some of them were employees of the defendant. There were 25 to 30 people making the fishing in the river a business. There was no public crossing over these tracks anywhere in the vicinity. The tracks at the place in question were traversed by people for many years, prior to the casualty in question. Deceased and his brother crossed these tracks sometimes a dozen times a day in connection with their fishing lines. They had lived on the bluff for about two years. According to plaintiff's evidence there was no warning sign present and no other kind of warning given people not to cross the tracks.

There was ample evidence from which the jury could find that defendant's agents and servants knew of the use of the path crossing the tracks at the point in question. In fact, defendant introduced in evidence its "exhibit C" without restriction. It showed a path marked thereon, leading from a point on the "old road," across defendant's right of way, to the south rail of track Number One; and the point of accident as marked on the exhibit showed deceased was struck at a place between the north rail of track Number One and

the south rail of track Number Two, in what would have been this path had same been projected across these tracks. Therefore, defendant, from its own evidence, is almost precluded from denying the existence of the path in controversy. [Scotten v. Metropolitan Life Ins. Co., 68 S. W. (2d) 60, l. c. 73, a dissenting opinion which was sustained by the Supreme Court.]

Deceased's brother testified for plaintiff that he "guessed" the distance between the north rail of track Number One and the south rail of track Number Two, the space in which deceased and his brother were standing when the casualty occurred, was about seven and one-half feet; that he didn't measure it; and that he didn't have very good judgment as to distances down there for he did not work there. This evidence is of practically no probative value for it was not substantial evidence on the point. [Carpenter v. Wabash Ry. Co., 71 S. W. (2d) 1071, l. c. 1072, 1073.] A civil engineer testified for defendant that the distance between these tracks was 10 feet; that the overhang of the engine that struck deceased was three feet and a fraction of an inch; that the ends of the ties extended eighteen inches beyond the outside of the rail; that the engine in question was a regular road passenger engine type; and that the overhang of a boxcar is about eighteen inches. In view of the absence of evidence on these points on behalf of plaintiff, of the positive and uncontradicted evidence to the above effect offered by defendant, and of the fact that plaintiff hypothesizes his argument in this court upon the assumption the facts stated in this paragraph are true, we, also, assume same to be true.

Defendant urges that deceased was guilty of contributory negligence as a matter of law, in taking a stand so close to the track as to be struck by a passing train. To this contention plaintiff answers, first, that defendant's agents were guilty of "wilful and wanton negligence" under the laws of Kansas, and, that being true, contributory negligence is no defense. Contributory negligence is no defense if defendant is guilty of "wilful and wanton negligence." [Kansas Pacific Ry. Co. v. Whipple, 39 Kan. 531, l. c. 541, et seq.] There is a substantial difference between "ordinary" negligence and "wilful and wanton" negligence or misconduct. Plaintiff says this is so, and the courts of Kansas have so held.

"Although what is really reckless and wanton misconduct is sometimes spoken of as gross negligence, the expression is everywhere recognized as inaccurate and unfortunate, because it seems to imply a difference only of degree, whereas, the whole doctrine that contributory negligence is no defense where the injury is the result of recklessness and wantonness is based upon the theory of a difference in kind. For the same reason the phrase 'reckless and wanton negligence' has a misleading tendency." [The Atchison, Topeka &

Santa Fe Ry. Co. v. Baker, Admr., 79 Kan. 183, l. c. 189.] The case was tried and submitted below on the theory that defendant was guilty of negligence as the term is ordinarily understood.

Plaintiff urges that, at the time when the demurrer was passed on, no instructions had yet been offered and we should now go back of the theory adopted in the trial court and sustain that court's action because, it is urged, plaintiff had pleaded and proved "wilful and wanton" negligence, and the action of the trial court in overruling the demurrer should be considered in light of the situation as it stood before submission. That is the law. [Bright v. St. Louis Vitrified & Fire Brick Co., 201 S. W. 641; Schroeder v. Wells, 310 Mo. 642.] However, we cannot agree that plaintiff made out a case of "wilful and wanton" negligence, or misconduct, as it is sometimes called. The casualty occurred at night, and, while the yards were covered by floodlights, they were not "as light as day;" deceased was struck on the main line far from any "public" crossing; the casualty was on a curve where it is unlikely that deceased was at any time within the glare of the engine headlight, had there been one; the engine that struck him was passing a freight train at this point, which freight train was on the next track north; the crew of defendant's engine were watching and did not see deceased at any time, and, although plaintiff offered evidence that the crew shouted at deceased, as the engine passed, yet there is no evidence that they saw or could have seen deceased *in time to have avoided hitting him;* and plaintiff's only witness to the actual occurrence. refused to testify positively that the bell was not ringing or that there was no light on the engine, but, only, that he did not see any light or hear any bell. He did not see the engine until it was within five feet of him, at which time the light, if any, would have been over his head and pointing off at an angle on account of the curve; and the freight train passing might have drowned out the noise of the bell if it had been ringing. In making these observations we are not attempting to *weigh* the evidence but only pointing out that it does not seem to convict defendant of "wilful and wanton" negligence under the Kansas decisions cited by defendant, which we are bound to observe (Sec. 806, R. S. Mo. 1929), and that this case does not fall within the facts of The Atchison, Topeka & Santa Fe Ry. Co. v. Baker, Admr., 79 Kan. 183, l. c. 187; Kansas Pacific Ry. Co. v. Whipple, 39 Kan. 531, and other cases examined by us and relied on by plaintiff. Our holding in this connection is further supported by the fact that plaintiff submitted but three instructions, all of which were given by the court, No. 2 thereof being as follows:

"The court instructs the jury that the word 'negligence', as used in these instructions, means the failure to exercise ordinary care, and ordinary care is that care which an ordinarily careful and

prudent person would exercise under the same or similar circumstances.''

· Plaintiff below evidently thought, after the demurrer was overruled, that there had been no proper showing of ''wilful and wanton'' negligence, and only brings forward that theory after he reaches this court, and then only to avoid the consequences of deceased's contributory negligence, if any. We adhere to the theory that plaintiff adopted below, that there was not proved sufficient facts to justify an instruction of ''wilful and wanton negligence.'' In so holding we do not hold that plaintiff, in law, abandoned the ''wilful and wanton'' negligence theory, but merely observe that plaintiff, apparently, from his course of conduct below, did not at that time take a different view from that herein expressed by us. Had plaintiff submitted an instruction based upon ''wilful and wanton'' negligence, it would have been the duty of the trial court to refuse said instruction. Therefore, we hold that the demurrer to the evidence, if considered in connection with this phase of the case only, should have been sustained by the trial court. The rule laid down in Gordon v. Metropolitan Street Ry. Co., 153 Mo. App. 555, l. c. 565, is not applicable here.

This brings us to the final phase of the case: Was deceased guilty of contributory negligence? If so, the case must be reversed. This point must be determined under the laws of Kansas, Riley v. The Kansas City Southern Railroad, 256 Mo. 596.

In considering the demurrer to the evidence we must consider all evidence in the record, both that offered by plaintiff and that offered by defendant, which is favorable to plaintiff, as true; we must draw all reasonable inferences therefrom that are favorable to plaintiff; and we must disregard all evidence offered by defendant which is unfavorable, and we must also disregard all such inferences based thereon. [Sec. 948, R. S. Mo. 1929; Reed v. Cullor, 32 S. W. (2d) 296; Schroeder v. Wells, 310 Mo. 642, l. c. 649.]

The evidence of plaintiff shows that deceased was well acquainted with the tracks and the yards where he was killed, both by day and by night. He had been in, upon, and over them almost daily, and, in some instances, several times during a single day and night. His knowledge thereof covered a period of about two years. He chose to go, at night, across the main line tracks of defendant where he knew that, on two eastbound tracks and two westbound tracks, engines and trains were passing on each or all at periods of a few minutes apart at all hours, some going east and some going west. The testimony of deceased's brother showed this. The evidence showed that deceased stood in a space between tracks One and Two, facing the north, watching one train pass east on track Three. As heretofore pointed out, the distance between the rails of the track

behind him and the rail of the track in front of him, was 10 feet There was ample room for one to safely stand between these tracks, even with trains passing on both at the same time. Knowing that he was in a place of danger; knowing that a train might at any minute appear on the track he was facing, and that the light in the yard was not as good as daylight; knowing that he stood on a curve where it would be difficult to see and where it would be difficult for the crew of an approaching train to see him; and knowing that the noise of the passing freight train would make it difficult for him to hear another approaching train; knowing all these things as he is bound to have known them, his sense of sight and hearing being good, as his brother testified, he yet deliberately chose to await the passing of the freight train while standing "at about the end of the ties" of the track in front of him. In such a position, eighteen inches from the track itself, a man who had lived for two years within sight of one of the busiest railroad treminal yards in the Middle West, was bound to know that he was liable to be struck by even a passing boxcar, and much more likely to be struck by an engine with its greater overhang. Plaintiff argues that one is not negligent of his safety if, while standing at a point where he believes he will be safe, he is there struck, by reason of some unusual "overhang" of a passing car or engine. He cites two Missouri cases where a person was struck while standing at a regular public crossing on a curve and the rear end of the passing car swung further out in rounding the curve. In those cases, the rear end swung out, in rounding the curve, far beyond the usual overhang. But here deceased stood within the path of the overhang of even an ordinary boxcar. Nor was the "overhang" of the engine that struck him an "unusual overhang," as suggested by plaintiff. Plaintiff's chief witness, deceased's brother, said the engine was the usual standard road engine used by defendant on this and other parts of its main line. A normal adult person is expected, and is required, to use due care for his own safety, and, failing to do so, cannot hold another for his injury under the doctrine of ordinary negligence. We are not concerned here with the humanitarian doctrine or with the "wilful and wanton" doctrine.

Plaintiff urges that if deceased had been struck by reason of a pole having been carried crosswise on the cowcatcher of the engine he ought not to be charged with contributory negligence. A sufficient answer to that is: He was not struck in this manner. He was struck by the passing engine, a usual passenger-type engine. Nor is there even evidence that he was struck by the piston, which part extended furthest out. The evidence shows only that he was struck by some part of the engine. He may have been struck by some part

before the piston reached him, so far as the evidence shows, considering the distance he stood from the track.

Plaintiff says deceased was looking out for danger because he constantly looked each way up and down the track. His contributory negligence consisted in his having, before the danger arrived, chosen to take a stand at a place where he must inevitably be struck if a train passed on the track. The point where plaintiff's evidence showed he stood was almost as dangerous as if he had stood on the track itself. In the latter case, under the circumstances here, we think no reasonable person would say he was not guilty of contributory negligence; and the fact that defendant's train ran at a high rate of speed, without lights and without ringing of the bell or the sounding of the whistle cannot avail plaintiff. We think the case of The Atchison, Topeka & Santa Fe Ry. Co. v. Withers, 69 Kan. 620, 1. c. 623, is directly in point. There deceased was at a public crossing. The night was dark and cold. He had his collar turned up and was waiting for a train to pass on an adjacent track when he was struck by a freight car, shunted by defendant, and which freight car was without lights, guard or signal. There, as here, deceased could have stood in a place of safety by standing farther back but negligently stood at a place where he was struck by the car. The court said:

"Much evidence was introduced to show that the deceased men were standing upon track 4; it seems highly probable that they were, though the jury found that they were not; but whether they were exactly upon the track or not seems of small moment, for the fact is that if they were not between the rails they were in a place of equal danger. It was not necessary for them to stand in a place of danger, as they could have stopped west of track 4, or could have safely stood between tracks 3 and 4."

And, 1. c. 625, the court further said:

"There was ample room for them to stop in a place of safety; others did so. Their exposing themselves to this obvious danger can only be accounted for upon the hypothesis of their reckless indifference to the danger which was so apparent and to their own safety." It may here be said that deceased's brother stood near but was not struck. See also Hoopes v. The Atchison, Topeka & Santa Fe Ry. Co., 72 Kan. 422; Zirkle v. Mo. Pac. Ry. Co., 67 Kan. 77.

In the case at bar, the negligence of defendant, as claimed by plaintiff, is conceded; but the demurrer should have been sustained because of the contributory negligence of deceased. Under the law of Kansas, whether or not the facts constitute contributory negligence is a matter of law to be passed upon by the court. [Kansas Pacific Railway Co. v. Pointer, 14 Kan. 38; The Atchison, Topeka & Santa Fe Ry. Co. v. Withers, supra, 1. c. 628; Libbey v. The At-

chison, Topeka & Santa Fe Ry. Co., 69 Kan. 869; The Atchison, Topeka & Santa Fe Ry. Co. v. Willey, 60 Kan. 819.]

The judgment is reversed. *Campbell, C.,* concurs.

PER CURIAM:—The foregoing opinion of SPERRY, C., is adopted as the opinion of the court. The judgment is reversed. All concur.