Plaintiff resided at Wilkesboro, and was employed by defendant from July to and including 4 December, 1916, as extra force foreman, in repairing the damage done to defendant's roadbed from North Wilkesboro to Winston-Salem, made necessary by the July flood of 1916, and was provided with a force of men and a work train for the purpose of moving plaintiff and his men from place to place and to such points as the plaintiff was directed to go by the men in charge over him, viz., C. W. Anderson, supervisor, E. L. Bird, assistant supervisor, and Mr. Martin, another assistant supervisor. While plaintiff was riding on said work train from Abolee (a side track 7 miles east of Elkin), between 5 and 6 o'clock on 4 December, 1916, for the purpose of transferring to the passenger train at Elkin, as he had been directed so to do by assistant supervisor Byrd, it collided with the rear end of defendant's westbound freight train at Elkin, severely and permanently injuring plaintiff, and he brings this action to recover damages for such injuries, which he alleges were caused by defendant's negligence.
The defendant, in its answer, admits "That immediately after the July flood of 1916, the plaintiff was employed by the defendant in the capacity of extra force foreman, and was provided with a force of men and a work train to move plaintiff and his men from place to place, to such points as the plaintiff was directed by the men in charge over him, to wit, C. W. Anderson, supervisor, E. L. Byrd, assistant supervisor, and a Mr. Martin, assistant supervisor," but defendant denies liability for the injuries to the plaintiff for that on the particular day of the injury, as it alleges, arrangements had been made for the passenger train to stop at Abolee and take plaintiff to his home at Wilkesboro, but plaintiff, for his own convenience, had, prior to the coming of the passenger train, taken passage on the work train to Elkin, there to board the passenger train for North Wilkesboro, and denied that plaintiff had been directed by assistant supervisor Byrd to board the work train and go on it to Elkin, and there catch the passenger train for his home at Wilkesboro. Defendant also denied it had been negligent; but if it had, plaintiff knew that the afternoon passenger train was to stop at Abolee for him, and he assumed the risk of the caboose being run in front of the engine so as to obstruct the view of the engineer.
The plaintiff testified: "I went down there (to Abolee) and went on the train to Rockford; put my men on at Abolee, and there I saw Mr. Byrd and asked him if anything had occurred, and he said he had heard nothing yet; there might be something by the first of the year. I said if he approved of my work, would he give me a recommendation, and he said he would be glad to, and I have it with my things. The work *Page 647 
train came up and I came with Mr. Byrd to Abolee. I went out and took all the men to work and turned them over to Mr. Will Byrd, and told Mr. E. L. Byrd that Mr. Crews said he would stop for me at Abolee, but I would have to flag him down. He said, `I will tell Mr. Love for you to go on the work train, and you need not flag him. You can go from Elkin home, and I will ask him to take you there.' Mr. Love told me that Mr. Byrd told him to carry me to Elkin. Mr. Love was conductor on the work train. I got some of the men who were working for me from Mount Airy, Wilkesboro, and Brushy Mountain. Some of them went to Abolee with me and I turned them over to Mr. Byrd. After Mr. Byrd told me to get on the work train, he said I could go on the Shoo-fly home. That was the train on which Mr. Crews was conductor. When he told me to get on the work train he said to put my things on the train and take them. We put them on and brought them to Elkin, and Mr. Sparger, the engineer, and Mr. L. A. Allen, flagman or brakeman, helped me, and Mr. McDowell packed them in the car. We left Abolee Monday evening some time after six. I was in the caboose in the end next to the engine, the caboose being in front of the engine. I had seen the freight train before that evening going west towards Elkin. Don't remember whether it was on time. When it passed Abolee they had a box car on the rear of the train hitched to the caboose. the caboose is used for conductor and flagman and those to ride in, and it is supposed to be attached to the rear end of the train, but there was a car which had a drawhead pulled out the rear end, so that car was coupled behind the caboose. The west end of the car was fastened to the caboose, the drawhead, or coupling, was off the east end, and so there was no way to hitch to that end, and I saw no way for it to display a signal. On a caboose there is an arrangement to display signals; you can hang your lantern on the rear end. They generally have a red light on the rear of freight trains after night. When we left Abolee the caboose was in front of the engine, being pushed towards Elkin, no other car in front of the caboose. In the caboose with me were Mr. Sparger, Mr. Allen, and Mr. McDowell. It was very dark when we got to Elkin. Before we got there, flagman Allen and brakeman McDowell were in the cupola of the caboose, which is a little place fixed above the caboose to have an outlook forward towards the engine. While they were there there was no light displayed in front of the caboose in which we were riding, nor any signal, and the caboose being in front of the engine obstructed the headlight of the engine, so that it could throw the light only against the caboose. My recollection is that Mr. Allen and Mr. McDowell came out of the cupola and walked out of the door about half a minute before the crash came, and it was very near the trestle, not more than one hundred feet below the woolen mills. *Page 648 
The train was running about ten or twenty miles an hour; that is my best though of it. There was no light displayed on the rear of the freight train; I was looking out of the door and there was no light at all. Our work train was being operated on the main track and the freight train was standing on the main track at Elkin. I never saw any flagman there to flag our train down. At the time our train ran into the freight train I was in the front end of the caboose; Mr. Allen and Mr. McDowell were on the platform; they stepped about six or eight feet ahead of me. They ran into the box car, and it smashed all up, and I went down in the scramble and somebody picked me up and they toted me out and laid me on some of the cross-ties. It was dark when they carried me out and I could not see how many cars were torn up. Before the crash I was in the caboose; after the crash I was in the lumber where the caboose was mashed, under wreckage. I was hurt; don't know what all was on me. The wreck mashed me practically all to pieces — through my body, through my side and back, hip, legs, hands all mashed, places cut in my face, and right ankle and a bone broken or cracked, which swelled up as big as two legs. My legs were brushed and mashed and had cut places, thighs mashed and blood-shotten. No bruises left now. Since the injury my physical condition has been bad, not able to do anything, suffered all kinds of pain. Suffered awfully that night; couldn't sleep; suffered severe pains eight or ten days; suffer yet. I didn't think that I could live."
The jury returned a verdict for the plaintiff, finding that defendant was negligent; that the plaintiff was directed by E. L. Byrd, defendant's supervisor, to go to Elkin on the work train, and there board the passenger train for Wilkesboro, and assessed the damages.
Judgment upon the verdict and appeal by the defendant.
After stating the case: It appeared in this case, after the second section of the complaint and the answer thereto, that defendant admitted the authority of E. L. Byrd over the movements of the work train, and that the person in charge of it was subject to his direction and control. This is the purpose of the admission and, it being true, we do not see why the plaintiff was not entitled to have the jury say whether he was rightfully on the train when it collided with the freight train and injured him. In addition to this admission, it appears that the plaintiff, as extra force foreman of that section of the railroad, was, by consent of E. L. Byrd, who, it appears, had the supreme control, permitted him to go to Wilkesboro on the Saturday before the *Page 649 
collision and come back with his men on Monday, with the promise that he should be returned by train to his home at Wilkesboro, where he was accustomed to go, on Monday evening, he having been superseded in his position as foreman by another man, the brother of E. L. Byrd.
Counsel for defendant, in the argument, did not contest his right to be thus returned to his home, but relied upon what he claims was a direction to plaintiff that he should go by the passenger train, which he had arranged to take at Abolee, by flagging the conductor of that train, so that he would stop at the station and take him on. But all these were but questions of fact to be settled by the jury, and they have found against the defendant.
We are not disposed to hold that the plaintiff, when riding to Elkin on the work train for the purpose of taking the passenger train there for Wilkesboro, was not then in the service or employ of the defendant. He was in its service when he left Wilkesboro on Monday, because he had been engaged by E. L. Byrd, the supervisor, on the Saturday before to come back to Abolee on that day, with the promise that he could return on one of the defendant's trains to Wilkesboro.
The plaintiff testified: "I thought my job had terminated that day — was out that day. I was taking my things home when I got hurt, and when I got home I thought I was through with the company." By this he meant, of course, that the company had induced him to return to Abolee Monday with a promise to give him passage in its train to his home in the evening, and that he was still in the employ of the company until he had finished his journey and reached his home. The defendant, in its brief, says, "Under the circumstances, we think undoubtedly the defendant owed the plaintiff the duty to take him back to North Wilkesboro."
We concur in this opinion, and add that it was so contemplated by the parties when plaintiff was ordered back to Abolee on Saturday, and so expressly agreed, according to his testimony.
It appears that the plaintiff was received on the work train by Mr. Love, who had charge of it when it started, and that none of the other employees, including Mr. Allen, who claimed to be the conductor, objected to his being on the train. There is also evidence that it was customary for him to ride on that train. The conductor of the passenger train, while willing to carry the plaintiff to Wilkesboro and to stop at Abolee on receiving a signal for him, stated that he preferred not to stop for that purpose. Under these circumstances, it was not illegal for him to board the work train with Mr. Byrd's permission. The latter seemed to have full authority to act for the company, being in charge at that place, and his general authority over the work train was not *Page 650 
or at least it cannot be questioned. Everybody appeared to be subordinate to him and subject to his orders.
In the case of McNeill v. R. R. Co., 135 N.C. 699, the Court said, quoting from Waterbury v. R. R. Co., 17 Fed., 671: "The right which a passenger by railway has to be carried does not depend on his having made a contract, but the fact of his being there creates a duty on the part of the company to carry him safely. It suffices to enable him to maintain an action for negligence if he was being carried by the railroad company voluntarily, although gratuitously, and as a mere matter of favor to him." And again: "A careful examination of the evidence shows quite satisfactorily that the case did not justify the assumption in any aspect of it that the plaintiff was entitled to be carried as a passenger, as an implied condition of the contract to carry his cattle. The most that can be fairly claimed for the plaintiff upon the evidence is that he was riding upon the engine permissively. If he was riding there with the consent of the defendant, express or implied, it is not material, so far as it affects the defendant's liability for negligence, whether he was there as a matter of right or as a matter of favor, as a passenger or a mere licensee. It suffices to enable him to maintain an action for negligence if he was being carried by the defendant voluntarily. It the defendant undertook to carry him, although gratuitously and as a mere matter of favor to himself, it was obligated to exercise due care for his safety in performing the undertaking it had voluntarily assumed," citing R. R. Co. v. Derby, 14 How., 468;Steamboat Co. v. King, 16 How., 469.
There are other authorities cited in McNeill v. R. R. Co., supra, which are applicable to this case, and we refer to them generally and without doing so by their names.
It is said in 4 Ruling Case Law, at sec. 589: "A common carrier providing sufficient means for the accommodation of its passenger traffic is under no obligation to receive and transport persons on other than its regular passenger vehicles, yet if it does so, it assumes toward them the same duties and must exercise the same care, so far as the means of transportation permit, which would be due them if they were traveling on a conveyance regularly intended for passengers, and the passenger assumes only such risks as are necessarily incident to the character of the conveyance and the purpose for which it is being operated. This rule has been frequently applied in the case of persons transported on freight or mixed trains, special trains, construction trains, and logging railroads." And at sec. 593, it is said: "There are also decisions making a distinction in the degree of care required towards regular passengers and as to persons being transported on the vehicle of a carrier, who *Page 651 
while not regular passengers are yet not trespassers, as, for instance, in the case of one permitted to ride without payment of fare upon a conveyance not devoted to the carriage of passengers, and holding that as to such persons the carrier is required to use only ordinary care, and is not liable for slight negligence."
This accords somewhat with what is held in McNeill's case, supra; but we need not endorse or approve this principle, or even discuss it, for in this case it is apparent that there was not only gross negligence in the operation of the train, but even a degree of recklessness which may have amounted to wantonness, as defined in 8 Words and Phrases, at p. 7386. These are some of the meanings of that word, as stated by the courts: "Wantonness is a course of action, or of conduct, taken without regard to the rights of others." Everett v. Receivers, 121 N.C. 519; S. v.Brigman,. 94 N.C. 888, 889; Welch v. Durand, 36 Conn. 182, 184. "It is conduct willful or unrestrained action, or running immoderately into excess." Cobb v. Bennett, 75 Pa., 326, 330; K. P. Ry. Co. v. Whipple,39 Kans., 531. It is that degree of recklessness, with a conscious knowledge of its probable harmful consequence, which, in law, finds its equivalent in willful or intentional wrong. B. S. Ry. Co. v. Powell, 136 Ala. 232. It is the conscious and intentional failure by one charged with a duty to exercise due care and diligence to prevent injury after the discovery of peril, or under circumstances where he is charged with the knowledge of such peril and being conscious of the inevitable or probable results of such a failure. Birmingham R. E. Co. v. Pinckard, 124 Ala. 372. It is a reckless disregard of the rights of others where serious damages may ensue.W. U. Tel. Co. v. Lawson, 66 Kan. 660.
We need not go to the length of holding, in order to dispose of this case, that the conductor of the defendant's employees in charge of this train and those in charge of the freight train was wanton. There was a gross inattention to duty, such as would in all probability result in very serious injury to the persons on the train, including the plaintiff.
The case in some of its salient features is not unlike B. S. RailroadCo. v. Powell, 136 Ala. 232; St. Joseph, etc., R. Co. v. Wheeler,35 Kan. 185; Kansas City R. Co. v. Berry, 53 Kan. 112. The train was running in violation of a statute and in a reckless manner, and, without the aid of the statute, the conduct of those in charge of the train was not only negligent, but grossly so. The rule as to the degree of care to be exercised towards a person in a freight or construction train was stated inWallace v. R. R. Co., 98 N.C. 494; Marable v. R. R. Co., 142 N.C. 557;Usury v. Watkins, 152 N.C. 760.
The Court in Wallace v. R. R. Co., supra, at p. 498, said: "A `caboose' *Page 652 
attached to a freight train does not furnish all the appliances and conveniences for the safety and comfort of passengers that are provided for passenger trains, and while it is the duty of the company carrying passengers on such a train to exercise every reasonable care and take every precaution against injury or danger to the life of such passengers which are the appliances for that mode of transportation will admit of, it is also the duty of the passenger who travels on such a train with a full knowledge of the increased risk incidental thereto to be correspondingly careful in guarding against injury by reason of the risk incidental to such mode of travel. An act may be negligent or not, according to the attendant circumstances."
The above cases sustain the judge's charge as to the degree of care, and it was not at all unfavorable to the defendant. The two trains were practically without any lights or other safeguards, and this fact is what caused the collision with its fatal result.
This case is not like Vassor v. R. R. Co., 142 N.C. 68, or Peterson v.R. R. Co., 143 N.C. 260, for here it was part of the contract made on the Saturday before that the plaintiff should be returned to his home at Wilkesboro by the defendant's train, which formed a contractual relation between him and the company, and it was the officer who, with the requisite authority, made the contract with plaintiff for the company, who directed him to ride in the caboose and told the conductor to receive him on his train. The learned judge, therefore, was not in error when he required of the defendant the exercise of ordinary care toward the plaintiff in the operation of the train. The latter was surely entitled to such a degree of care and diligence.
After a thorough review of the case, we find no error that was committed in the court below.
No error.