LEE WATSON, BY HIS NEXT FRIEND, JOSIE WATSON, v. WARSAW CONSTRUCTION COMPANY.

(Filed 23 October, 1929.)

1. **Master and Servant C d—Failure to warn servant is not ground for liability for injury occurring after termination of employment.**

Where the *alter ego* of a principal orders an employee whose regular duty is to haul dirt for the construction of a highway, to take a box of dynamite caps to a tool-house, and fails to warn the servant of the danger in connection therewith, and the employee takes the box of caps to the tool-house in his pocket and deposits the box there, about a half hour being required therefor, and on the next day the employee is injured by an explosion supposed to have been caused from dynamite caps remaining in his pocket: *Held,* the master is not liable in damages for the failure to warn the servant, the injury having occurred after the particular employment had terminated.

2. **Negligence A d—In this case held: injury could not have been reasonably foreseen and defendant is not liable therefor.**

Where the *alter ego* of a principal gives an employee a box of dynamite caps to take to a tool-house, and the lid of the box is sprung, allowing,

from conjecture, some of the caps to escape from the box into the pocket of the employee, where they exploded the next day: *Held*, the defendant cannot be held to have reasonably anticipated that any harm would result from the fact that the lid of the box was sprung, and he is not liable in damages for the injury resulting therefrom.

3. **Negligence A a—A person is under duty to use care commensurate with danger.**

The degree of care which a person is required to exercise in a particular situation to absolve himself from the imputation of negligence may vary with the obviousness of the risk; but with respect to his liability, the ultimate question is whether he exercised due or commensurate care under the circumstances. The former doctrine of degrees of negligence disapproved.

APPEAL by defendant from *McElroy, J.,* at March Term, 1929, of SWAIN. Reversed.

The plaintiff brought suit to recover damages for personal injury alleged to have been caused by the explosion of dynamite caps negligently put into his possession by the defendant.

The defendant is a corporation, and at the time of the injury was engaged in blasting and grading a roadbed for a highway to be built from Hazel Creek in Swain County to the Tennessee line. The plaintiff had been in the employ of the defendant for two or three years, and prior to that time in the service of the defendant's predecessor. When injured he was the defendant's teamster. He was 18 years of age and weighed 90 or 95 pounds. His foreman was A. W. Whaley. His account of the injury follows: "I had been hauling for Warsaw Construction Company about two or three months. Mr. Whaley gave me and the other members of the crew orders and directions what to do. I kept my team near the river in a barn where I had been ordered by the company and Mr. Whaley to keep the team. The barn was pretty close to the highway. I was hauling dirt for the Warsaw Construction Company on the afternoon of 2 February, 1928. I went to the barn to put up my team. I was there doctoring my mule—doctoring his shoulder—and Mr. Whaley came and called me. I went by the name of Jack; he called my name and said, 'Here is a box of caps and a roll of fuse. I want you to carry it to the little shack and put the caps and fuse up over the door.' I told him all right, and he said that would be all right. I told him that just as quick as I got through doctoring my mule I would go. He said that will be all right. I laid the fuse down on the ground and put the caps in my pocket. I was wearing overalls. I put them in the right pocket. Mr. Whaley was standing there present when I put the box of dynamite caps in my pocket. He didn't say anything. He didn't give me any instructions or any warning as to the danger of the caps or explosives. He made no statements about it at all. It took me

something like 10 or 15 minutes to finish up my work there. After I did that I went on and done what he told me—put up the caps and fuse. The little house he ordered me to put them in was kind above the highway, right on the side of the highway, something like 75 or 100 feet from the barn. I put them up over the door like he said. There was dynamite, tools, leather and so forth and so on in that house. The house was not locked where the dynamite was kept. The door was open. After I put the caps, the box of caps, and the fuse, where I was ordered to put them, I went on to the house, to my boarding place. I was wearing loose overall pants. The shack was 100 feet from the barn. When Mr. Whaley gave me the dynamite caps he didn't tell me how many were in the box. After he gave me the roll of fuse and caps he went on to the house, I suppose. He went that way. The next day I was hauling pipe for him, for the Warsaw Construction Company, under the instructions of Mr. Whaley. I hauled two loads of pipe and got in about 1:30 and ran to the house and ate dinner and hurried back and started to haul another load, and Mr. Whaley called me and wanted me to move a pump down to the river to the little ferry. I took one mule and moved the pump to the boat and brought the mule back and hooked it into the wagon, and when I hooked it up I got on one side of the wagon and looked down and saw my whip on the ground, and I jumped down to get it, and when I hit the ground it fired. I don't know what it was that fired. The explosion occurred just as I hit the ground. It knocked me kind of backwards. I ran backwards to keep from falling, and I thought I could come straight. Mr. Luck was standing over from me; I thought I could walk to him, but I couldn't. I went around and around and fell backwards in the road and then raised up and saw that my leg was torn up. The leather lines were shot in two. My pants were shot all to pieces."

This is his description of the box containing the caps: "The box Mr. Whaley gave me was kind of a square box, about an inch and a half broad and about an inch and a half all the way. This is broader on this box than what he gave me. The lid on the other box was narrower than this. This shuts down tighter than the other one. It is broader. I put the box he gave me in my right overall pocket. I didn't know any caps had come out in my pocket. The lid would come off easy on that box. I didn't know they would come out in my pocket. I observed that the corners of the cap box he gave me were loose. They were loose in the corners like that. They were not fastened together." . . . "To the best of my knowledge the lid was sprung on the box that he gave me. After he gave me the box and I went up to the house, I didn't put my hand in my pocket. When I took the box out of my pocket the corner of the lid was raised up. When I took it out it pushed back on."

Speaking of the caps he said: "I put them down in my pocket, then took them to the shack. I put my hand in my pocket and took them out and put them up. I put up all that he gave me. . . . I didn't know I had any dynamite caps in my pocket. From 5 o'clock that evening after I took the dynamite caps and put them up I never had my hand in my right-hand pocket till the next day when I got hurt. I could have put my hand in my pocket and found out what I had, but I didn't, that I remember. The best I remember I didn't put my hand in there, for if I had I would have found something. When Mr. Whaley handed me the box of dynamite caps I didn't notice it; I just put it in my pocket. I glanced over the box and put it in my pocket. I didn't notice anything about it when I glanced over it. That was after I took it out of my pocket that I noticed one corner of the lid was raised. That was in broad daylight. When I took that box out of my pocket and noticed that the lid was pulled up, the foreman was not present and he didn't know anything about it. If the lid was pulled up and some of the caps had slipped out of the box, I never thought anything about it. I just put them up. I just pushed it back down a little. I never thought there was any caps in my pocket. I reached my hand in my pocket and then noticed that the lid was slipped up or had come off, but it went back on and I set it up. Seeing and knowing that, I didn't put my hand in my pocket to see if any of the caps had come out. I never thought about it."

Other witnesses were examined, but the plaintiff's testimony is for him the most favorable. At the close of the plaintiff's evidence and at the conclusion of all the evidence, the defendant moved for judgment as of nonsuit. Each motion was denied and the defendant excepted.

The issues of negligence, contributory negligence, and damages were answered in favor of the plaintiff, and he was awarded judgment, from which the defendant appealed upon error assigned.

*Sutton & Stillwell for plaintiff.*
*Edwards & Leatherwood for defendant.*

ADAMS, J. At 5:30 in the afternoon of 2 February, 1928, the plaintiff received the dynamite caps from the defendant's foreman and was injured by an explosion in his pocket on the day following at 1:30. The material allegations of negligence, as set forth in the complaint, are the defendant's failure to warn the plaintiff of danger in handling the caps and its failure to provide a safe box or container for their transportation. Let us consider each of these allegations in its relation to the plaintiff's evidence.

As to the first, it is conceded to be the duty of an employer to warn his employees concerning dangers which are known to him, or which

in the exercise of reasonable care should be known to him, and are unknown to his employees or are undiscoverable by them in the exercise of due care, and concerning dangers which, by reason of youth, inexperience or incompetency the employees do not appreciate. Under these conditions unless the servant is warned or instructed he does not assume the risk of such dangers, and if without fault or negligence on his part he receives an injury in consequence of not having been warned or instructed the master will be liable to him in damages. *West v. Tanning Co.*, 154 N. C., 44; *Norris v. Mills, ibid.*, 474; *Steeley v. Lumber Co.*, 165 N. C., 27, 34.

For the present purpose, we may admit the proposition that where explosives are given to a messenger for transportation in a package apparently harmless, and he has no information or notice of their general character, and carries them with the care adapted to their apparent nature, the person delivering the explosives will ordinarily be held liable for injuries resulting from an explosion during the period of transportation. But without saying that the jury may not reasonably have inferred from the evidence that the defendant had been negligent in failing to warn the plaintiff of probable harm, we are confronted with the fact that no injury resulted to the plaintiff during the course of his employment—*i. e.*, during the time he was engaged in obedience to the foreman's orders in carrying the caps from the barn to the shack. His regular service was that of a teamster. The reason of requiring warning in appropriate cases is to impress upon the employee the necessity of keeping the danger in mind while performing the specific duties required of him and to give him information by which to determine whether he will continue in the service. 39 C. J., 489. As a rule an employer will not be liable for failure to instruct an inexperienced or ignorant employee unless the injury sustained during the employment resulted from the employee's unskillfulness or want of knowledge.

With respect to the caps and the fuse the plaintiff's employment ceased, as we have indicated, when he put them in the house. He had nothing more to do with them. His service was of short duration: not more than thirty minutes intervened between the time he received the caps and the time he put them on the shelf. No accident or injury occurred on this short journey or while the particular employment continued. If the object of warning is to save the employee from injury while engaged in the service for which he is employed, the employer's failure to warn him will not, as a general principle, be held for actionable negligence where no injury is sustained during the continuance of the service, and will not be regarded as having contributed to an injury which did not occur during the period to which the instruction was intended to apply. *Mitchell v. R. R.*, 176 N. C., 645; *Wilson v. Clark*,

110 N. C., 364; *Mather v. Rillston,* 156 U. S., 391, 39 Law Ed., 464. For these reasons the plaintiff's first position cannot be maintained.

The second proposition advanced by the plaintiff raises the question whether the defendant failed in another respect to exercise due care for his safety.

The defendant had a right to assume that the plaintiff would obey the foreman's instructions and leave in the house all the caps the foreman had given him. To meet this situation the plaintiff avers that the defendant negligently failed to provide a suitable container, and that on account of a defective lid five or six caps came out of the box while it was in the pocket of his overalls, and without his knowledge remained there until the explosion occurred in the afternoon of the day following. He contends that his right to recover damages is not dependent upon the existence at the time of the injury of any contractual relation between him and the defendant. His allegation is this: "The plaintiff noticed when he took the box from his pocket at the shack that one corner of the tin or copper lid was slipped up slightly, but did not know that any of the said caps had come out of the box into his pocket." Elsewhere in the complaint he refers to the box as "containing one hundred caps and being made of tin with a loose and springy lid thereon." Upon his allegations he rests the contention that the defendant by its foreman, while the temporary relation of master and servant existed, negligently put in operation a dangerous agency which, continuing after the relation had ceased, caused an explosion which resulted in his injury. These allegations in their relation to the evidence must be considered in the light of familiar principles underlying the law of negligence.

The relation between the conception of negligence and liability in the field of trespass involves three propositions: (1) "For intentional injury done by the direct application of force a man is absolutely liable. (2) For injury done by the direct application of force under such circumstances that the law can ascribe to the actor an intention to do the harm, he is also absolutely liable. (3) But where the actual intention is absent and the circumstances are such that the law will not raise a presumption of intention against the actor, there liability cannot exist unless negligence, in the sense of some degree of blameworthy remissness or lack of care on the part of the actor is shown. In other words, negligence is essential to liability for unintentional injury, and it is a good defense in an action of trespass for unintended harm for the defendant to show that he was in no way negligent or to blame in doing the act which proximately caused the damage." 1 Street's Foundations of Legal Liability, 74.

The essential elements of actionable negligence may be stated as (a) a failure to exercise commensurate care, (b) involving a breach of duty,

(c) resulting proximately in damage to the plaintiff. Hale on Torts, 449; Jaggard on Torts, ch. 12, sec. 246. The degree of care required of persons having the possession and control of dangerous explosives has been variously defined as "the utmost," "the highest," "reasonable," and "commensurate." *Brittingham v. Stadiem,* 151 N. C., 299; 25 C. J., 185. But in modern legal thought the notion that there are degrees of negligence is not approved. In *Wilson v. Brett,* 11 M. & W., 113, *Rolfe, B.,* assailing the propriety of distinguishing such degrees, insisted that negligence in any degree is merely negligence—a statement of the law to which our own decisions conform, except perhaps in reference to the law of bailment. *Hanes v. Shapiro,* 168 N. C., 24. It is said in *Ridge v. R. R.,* 167 N. C., 510, 526, to be "generally conceded that there is no classification of negligence with respect to the degree of care required in any given case, as being slight, ordinary, and gross, as such a distinction can serve no practical purpose and is often very misleading. *Steamboat New World v. King,* 16 How. (U. S.), 469, 475; *Milwaukee, etc., R. Co. v. Arms,* 91 U. S., 489; 8 Enc. of U. S. S. C. Reports, pp. 878, 879, and notes." Also that "the requisite degree of care to be employed is that which is suited to the particular transaction being investigated, and reasonably commensurate with its circumstances and surroundings, that being supposed to be the care which any man of ordinary prudence will use, as dictated to him by a natural sense of his own protection and safety, if his personal rights were involved." And in *Commissioners v. Jennings,* 181 N. C., 393, 400: "Counsel discussed before us at some length the difference between ordinary care, the highest degree of care and gross negligence, but we deem it unnecessary to draw any distinction between them. It is all but ordinary care, which means that degree of care which a man of ordinary prudence would use in the same or similar circumstances." The degree of care which a person is required to exercise in a particular situation to absolve himself from the imputation of negligence may vary with the obviousness of the risk; but with respect to his liability the ultimate question is whether he exercised due or commensurate care.

There is no substantial basis for the plaintiff's contention that the defendant did not exercise the required care in providing a suitable container for the caps. It is generally held that "reasonable foresight of harm supplies the criterion for determining the preliminary question whether negligence exists in a particular case." The defendant contends that under the circumstances related by the plaintiff it could not reasonably have anticipated or foreseen the infliction of any injury. According to this theory foresight of harm is a condition of liability, the test of the defendant's negligence being whether in the exercise of due care

it could have foreseen, not necessarily the specific injury sustained, but consequences of a generally injurious nature. While a person may be charged with knowledge of that which as a reasonably prudent person he should have foreseen, he is not under any duty to foresee what a reasonably prudent person would not have foreseen, or under any obligation to provide against a danger he would not reasonably have anticipated. In *Carter v. Lumber Co.*, 129 N. C., 203, 209, it is said: "No act or omission, though resulting in damage, can be deemed actionable negligence unless the one responsible could, by the exercise of ordinary care under all the circumstances, have foreseen that it might result in damage to some one. 16 Am. & Eng. Enc., 439; Pollock on Torts, 36, 37; Shear. and Redf. on Neg., 10. There must be, before a recovery can be had in actions for negligence, a breach of duty on the part of the defendant, and the act or omission, producing the breach of duty, culpable in itself, must be such as a reasonably careful man would foresee might be productive of injury; and one is not liable for an injury which he could not foresee. Smith on Neg., 24; *Blythe v. Water Co.*, 11 Exc., 781." And in *Drum v. Miller*, 135 N. C., 204, 208: "There is a distinction, we think, between the case of an injury inflicted in the performance of a lawful act and one in which the act causing the injury is in itself unlawful or is at least a wilful wrong. In the latter case the defendant is liable for any consequence that may flow from his act as the proximate cause thereof, whether he could foresee or anticipate it or not; but when the act is lawful, the liability depends, not upon the particular consequence or result that may flow from it, but upon the ability of a prudent man, in the exercise of ordinary care, to foresee that injury or damage will naturally or probably be the result of his act. In the one case he is presumed to intend the consequence of his unlawful act, but in the other, while the act is lawful, it must be performed in a careful manner; otherwise it becomes unlawful, if a prudent man in the exercise of proper care can foresee that it will naturally or probably cause injury to another, though it is not necessary that the evil result should be, in form, foreseen." Also in *Bradley v. Coal Co.*, 169 N. C., 255: "Before there could be a recovery on the part of the plaintiff it was necessary for him to show a breach of duty on the part of the defendant . . . some act or omission producing the breach culpable in itself and such as a reasonably careful man would foresee might be productive of injury; for one is not liable for an injury which he could not foresee." Of like tenor are *Winborne v. Cooperage Co.*, 178 N. C., 88; *Jefferson v. Raleigh*, 194 N. C., 479; and *Street v. Coal Co.*, 196 N. C., 178.

But the foresight of harm as an element of actionable negligence must not be confused with foresight as an element or test of proximate cause.

The idea that a wrongdoer is liable in damages for all the consequences which flow from his wrongful act is sometimes expressed by saying that the consequences for which he is liable are those which he ought reasonably to have foreseen; but anticipation of harm as an element of negligence is distinct from the anticipation of consequences as an element of proximate cause. The latter phase is set forth in *Brewster v. Elizabeth City,* 137 N. C., 392; *Wright v. Thompson,* 171 N. C., 88; *Whitt v. Rand,* 187 N. C., 805, 808, and other cases. See 45 C. J., 656, 657, 913, 917.

The container was a small tin or copper box, the lid of which, according to plaintiff's testimony, would come off easily, because the corners were loose and not fastened together. He said that to the best of his knowledge the lid was sprung and that he pushed it back when he took the box from his pocket: "I reached my hand in my pocket and then noticed that the lid was slipped up or had come off, but it went back on and I set it up; seeing and knowing that, I didn't put my hand in my pocket to see if any of the caps had come out. I never thought about it." When he retired at night he laid his pants by the side of the bed, and the next day he wore them.

It is important to note the plaintiff did not say that any of the caps came out of the box and remained in his pocket; this is a matter of conjecture. He did not say that any of the caps exploded in his pocket. His words were, "I jumped down to get it (his whip), and when I hit the ground it fired. I don't know what it was that fired."

The plaintiff's evidence considered as a whole does not disclose conditions from which we can conclude as a matter of law that the defendant should reasonably have foreseen that dynamite caps would escape from the box and be carried in the plaintiff's pocket for nearly twenty-four hours and then, when subjected to a jar, explode and inflict the alleged injury, or, indeed, that any other injury would result. In the box there was manifestly no defect that was not as apparent to the plaintiff as to the defendant—in any event nothing more than an ill-fitting lid; and if the plaintiff, after seeing the lid was loose, did not suspect that caps might have been left in his pocket, it is not reasonable to say that the defendant should be held to liability for failing in the exercise of due care to foresee such an unusual and unaccustomed contingency.

The motion for nonsuit should have been granted.    Judgment
Reversed.