No. 31,183

MAUDE STOUT, *Appellee*, v. A. T. GALLEMORE, *Appellant*.

(26 P. 2d 573.)

Opinion filed
November 11, 1933.

*Albert Faulconer, Kirke W. Dale* and *C. L. Swarts,* all of Arkansas City, for the appellant; *Douglas Hudson,* of Fort Scott, of counsel.

*W. L. Cunningham, D. Arthur Walker, Fred G. Leach* and *William E. Cunningham,* all of Arkansas City, for the appellee.

The opinion of the court was delivered by

HARVEY, J.: This is an action by a guest against her host for damages because of personal injuries sustained in an automobile casualty which are alleged to have resulted from the defendant's gross and wanton negligence. The jury answered special questions and returned a general verdict for plaintiff, on which judgment was rendered. Defendant has appealed and, among other things, contends that upon the record, and especially upon the special findings of the jury, plaintiff is not entitled to recover.

The pertinent facts may be stated briefly as follows: Plaintiff is a widow, and she and her grown daughter and a sister make their home together at Arkansas City. She kept the house and looked after some rooms and conducted a private kindergarten class for preschool children. Defendant is a widower and lives alone except for the occasional week-end visits of one of his adult daughters. In the yard at the rear of his residence he has a rose garden in which

he takes much interest. The parties met for the first time one afternoon in September, 1931, at the home of Mrs. Porter, a mutual friend, where plaintiff had gone to take some books Mrs. Porter desired to read, and defendant had gone to take Mrs. Porter a bouquet of roses. They were introduced by Mrs. Porter, and they all visited, perhaps twenty minutes, talking of books and roses. When defendant started to leave Mrs. Porter asked defendant to take plaintiff to her home, several blocks away, and he consented to do so. Plaintiff was a lover of roses, and defendant invited her to go by his rose garden, which they did. Defendant invited her to drive with him to Winfield, a distance of about fifteen miles, for dinner. They first went to plaintiff's home and then started for Winfield a little after five o'clock. As they neared Winfield defendant suggested that they drive to Wellington, about twenty-five miles farther, to take dinner at a well-known hotel. Plaintiff consented, and they drove to Wellington, where they had dinner, leaving the hotel about eight o'clock. They then drove through the park at Wellington, then to a filling station, where they stopped a few minutes, then to the residence of defendant's brother, where they stopped a few minutes but did not go in, and then to the main street of Wellington, where they stopped for a time in front of a drug store and were served refreshments. They differ as to the time they left Wellington. Plaintiff thought it was about eleven o'clock, and she was embarrassed by the long wait in the car at the stops, particularly on Main street. Defendant thought they left Wellington about nine o'clock. At any rate, they started back to Arkansas City, passed through Winfield about midnight, and were near the town of Hackney. They were traveling on an improved highway, which had an eighteen-foot pavement. Defendant had requested that plaintiff write on his blank check book, which he furnished her for that purpose, her telephone number, which was in the name of her sister, and her sister's name and address. Plaintiff was complying with his request, and in doing so had leaned forward so she could see to write by the dash light. While she was doing so the car struck the abutment of a cement culvert. Plaintiff was thrown forward. Her head struck the windshield with sufficient force to break it. Her jaw was broken, and she sustained other painful injuries about the face, neck and other portions of her body.

The parties differ as to just how the collision with the culvert came about. Plaintiff testified that in returning from Wellington

defendant undertook to make love to her; that on four different occasions before the casualty defendant had attempted to put his arm about her; that she had declined to permit it, and rebuked him for attempting it; that when about a quarter or half a mile from the culvert defendant had requested her to write her telephone number and address on a slip of paper which he furnished her, and although reluctant to do so she had consented.

"When I leaned over to write the number down in the book under the dash light, he grabbed me and tried to kiss me and hug me. Then we crashed into the bridge."

At that time she thought they were traveling at about 40 to 45 miles per hour. Perhaps her testimony in these respects was affected somewhat by that of the mechanic who repaired the car and who said, in his opinion, judging from the damage to the car, that it was traveling at about 15 miles per hour when it struck the culvert, and further by the testimony of the editor of one of the newspapers at Arkansas City to the effect that soon after this action was commenced plaintiff called at his office and stated that the other newspaper had not printed the story correctly.

". . . she came in and told me that it was wrong in the [other newspaper]; that they had had an accident, but it was wrong about the embracing, that Mr. Gallemore drove recklessly, but he hadn't tried to embrace her. . . ."

Defendant's testimony was to this effect: That plaintiff had permitted him to kiss her while they were in the rose garden at Arkansas City and several times while they were driving to Wellington; that when they started back from Wellington he laid his arm back on the seat and she permitted him to embrace her all the way except when they went through town; that they had talked of going to Wichita in a few days, where he had business, and he had asked her to accompany him and to go to a show with him in the evening, and she had consented; that since the telephone where she lived was in the name of her sister, he desired her sister's name and address and telephone number in order that he might call, and that he handed her his blank check book on which to write; that perhaps half a mile before the car struck the culvert he had released her from his embrace so that she could give her attention to writing, and she had leaned forward to use the dash light and to look through the book for a place to write, and was writing; that while she was doing so he met two cars, the second of which had exceptionally bright lights; that just after passing that car a man stepped into the highway from

the right-hand side directly in front of his car; that he turned his car to the left in order to miss him; that the man then stepped across to the left side of the pavement and had something in his hand, which he seemed to wave; that he then turned his car sharply to the right in order to avoid striking the man, when the car struck the culvert; that while he did not remember distinctly whether he had applied his brakes, when he later looked he saw that the wheels of his car had dragged as much as six to ten feet.

While the testimony of the parties differs somewhat in detail, it is clear from that of both of them that each was appreciative of the acquaintance of the other, and that they were mutually enjoying the evening ride. Directly after the collision defendant expressed sorrow at plaintiff's injuries. He stopped a passing automobilist, who called from a farm house near by for an ambulance. Defendant accompanied plaintiff to the hospital. He had been shaken up, but not seriously injured. Plaintiff, however, had the serious injuries heretofore mentioned. She was compelled to remain at the hospital for several weeks, and had not thoroughly recovered at the time of the trial. Defendant testified that he had driven very slowly after leaving Wellington and at the time his car collided with the culvert was going about fifteen miles per hour. Perhaps his testimony with reference to seeing the man in the highway and his efforts to dodge him was weakened by the fact that he first told it several hours after the casualty, and there were some discrepancies in it as it was told by him on different occasions.

In answer to special questions the jury found that plaintiff had been riding with defendant about seven hours prior to the accident; that they had driven about 75 miles that evening; that as they approached the culvert plaintiff and defendant could have seen the culvert, if they had looked, for about 200 feet before reaching it, and that plaintiff was not looking ahead as the car approached the culvert. Then these questions were asked and answered:

"7. Was the defendant guilty of gross and wanton negligence? A. Yes.

"8. If you answer question 7 in the affirmative, then state of what this gross and wanton negligence consisted. A. Driving recklessly. Failure to have his car under proper control."

When these answers were returned into court defendant requested the court to require the jury to return to the jury room for further answer to question No. 8 for the reason that no fact was stated, but

merely a conclusion. The court deemed the answer sufficient and denied the request.

The principal question before us is whether this establishes liability under our statute (R. S. 1931 Supp. 8-122b), which reads:

"That no person who is transported by the owner or operator of a motor vehicle, as his guest, without payments for such transportation, shall have a cause of action for damages against such owner or operator for injury, death or damage, unless such injury, death or damage shall have resulted from the gross and wanton negligence of the operator of such motor vehicle."

This statute is the outgrowth of a thought which had become common among our people, that it was too easy under our law relating to liability for negligence for one riding in an automobile as a guest of the driver to recover damages for injuries sustained in an automobile casualty. Similar statutes have been enacted in other states. Cases arising under such statutes are collected in the annotations in 74 A. L. R. 1198 and 86 A. L. R. 1145. We shall not take space here for a résumé of those statutes and decisions. It is sufficient to say that such statutes have been upheld in the courts of the several states which have them and by the supreme court of the United States (*Silver v. Silver*, 280 U. S. 117), as being an appropriate exercise of legislative power designed to remedy a recognized evil. These statutes differ somewhat in wording, but their purposes are similar.

While the wording of our statute, above quoted, received considerable attention by the legislature which enacted it (House Journal 166, Senate Journal 239 of our 1931 legislative session), the words "gross and wanton negligence," finally chosen, were not especially well selected. For many years in the earlier history of our state our statutes and decisions recognized three degrees of negligence—slight, ordinary and gross. (*U. P. Rly. Co. v. Henry*, 36 Kan. 565, 569, 14 Pac. 1; *C. K. & W. Rld. Co. v. Fisher*, 49 Kan. 460, 30 Pac. 462.) This classification of negligence into degrees lacked a firm basis for its existence, for the injuries sustained by one injured by the negligence of another were not increased or diminished by the classification into degrees of the negligence which caused the injuries. (*Kennedy v. Railway Co.*, 104 Kan. 129, 179 Pac. 314.) This classification caused much trouble to courts and litigants in attempting to apply their respective definitions to the facts of a particular case. Finally, in harmony with sounder reasoning and with the law of most other jurisdictions, the classifica-

tion of negligence into degrees was taken out of the law of this state. (*Railway Co. v. Walters,* 78 Kan. 39, 96 Pac. 346.) Due care became and is the sole test, and the lack of due care is negligence. Due care in respect to specific circumstances is thought of as that care which an ordinarily careful, intelligent, prudent person should and would normally exercise under like circumstances. The failure to exercise such due care is negligence, which failure may arise from acts of commission or from omission. Negligence, properly speaking, does not include willful, intentional injury. Negligence resulting in injury gives rise to an action for damages.

Under the former classification of degrees of negligence, gross negligence meant great negligence, or much negligence; the lack of slight care (*U. P. Rly. Co. v. Henry,* supra) or of any care. The term is still used in our statutes (R. S. 66-275), which provide briefly that railroad companies are liable to passengers on freight trains for injuries resulting from gross negligence only, and in cases arising under the statute this former definition of the term is still used. (*Jones v. Railway Co.,* 98 Kan. 133, 137, 157 Pac. 399.) Perhaps there are a few other instances where, by statute, the courts are required to give effect to our earlier definition of the term "gross negligence," but, generally speaking, the term has but little significance in our law.

Of those matters which give rise to a civil action for damages, when an injury results therefrom, we recognize in our law negligence, meaning by that the lack of due care. We also have willful injury, as where one willfully strikes another, or willfully destroys property of another, or intentionally does any act with the purpose and intent of causing such injury. Among the activities of individuals are acts or omissions, which give rise to civil actions for damages where injuries result therefrom, which are subject to more severe censure than negligence and yet which are something less than willful injury. The law applies to such acts the general term of wantonness. Wantonness is defined in 40 Cyc. 294 as—

"Action without regard to the rights of others; a reckless disregard of the rights of others; reckless sport; willfully unrestrained action, running immoderately into excess; a licentious act by one man towards the person of another, without regard to his rights; a conscious failure to observe due care; a conscious invasion of the rights of another; an intentional doing of an unlawful act, knowing such act to have been unlawful; the conscious failure of one charged with a duty to exercise due care and diligence to prevent an injury after the discovery of the peril, or under circumstances where he is charged

with a knowledge of such peril, and being conscious of the inevitable or probable results of such failure."

Other definitions may be found in Words and Phrases, first, second, third and fourth series, and, as applied to statutes similar to the one before us, in the cases collected in the A. L. R. annotations, *supra*. Standing, as it were, between negligence on the one hand and willful injury on the other, wantonness is sometimes linked with each of those terms. (45 C. J. 674.) Our own decisions and many others distinguish them.

In *K. P. Rly. Co. v. Whipple*, 39 Kan. 531, 18 Pac. 730, it was said:

"There is a distinction between ordinary negligence and recklessness, or wantonness, as defined in our decisions. A party may recover for the reckless or wanton conduct of another, or as we have said, 'for gross negligence amounting to wantonness,' without a formal and direct intention to injure any particular person. Mr. Bishop says: 'There is little distinction, except in degree, between positive will to do wrong, and an indifference whether wrong is done or not.' . . .

"Judge Cooley says: 'Where the conduct of the defendant is wanton and willful, or where it indicates that degree of indifference to the rights of others which may justly be characterized as recklessness, . . . the defendant is responsible for the injury he inflicts, irrespective of the fault which placed the plaintiff in the way of such injury. . . .'

"Recklessness 'is an indifference whether wrong is done or not—an indifference to the rights of others.' Wantonness 'is reckless sport, willfully unrestrained action, running immoderately into excess.' . . . In popular use and by our decisions 'recklessness' and 'wantonness' are stronger terms than mere or ordinary negligence." (pp. 541, 542.)

In *Railway Co. v. Walters*, 78 Kan. 39, 41, 96 Pac. 346, it was said:

"Reckless disregard of security, wantonness or other equivalent of bad faith and the willful or malicious disposition to injure, all involve something else than negligence."

In *Railway Co. v. Lacy*, 78 Kan. 622, 629, 97 Pac. 1025, it was said:

"To constitute willful negligence there must be a design, purpose or intent to do wrong or to cause the injury. True, the courts and text-writers quite generally agree that recklessness amounting to an utter disregard of consequences will be held to supply the place of specific intent (citing cases). And a reckless indifference to or disregard of the natural or probable consequences of doing or omitting to do an act which is generally termed wanton negligence, carries with it the same liability as an injury inflicted by willfulness. We deem it unnecessary to consider here the nice distinctions sometimes drawn by courts

in respect to willful negligence and wanton negligence. It is sufficient in our opinion that there was in this case an absence of affirmative or other testimony tending to show that the injury was occasioned by the wanton negligence of the engineer or that it was the result of that conscious disregard of, or reckless indifference to, the probable or natural consequences of his conduct which is usually termed wantonness."

In *Railway Co. v. Baker,* 79 Kan. 183, 189, 98 Pac. 804, the court quoted approvingly from *Birmingham Railway & Electric Co. v. Pinckard,* 124 Ala. 372, 62 So. 880, as follows:

"Wantonness, as has been defined by this court, 'is the conscious failure by one charged with a duty to exercise due care and diligence to prevent an injury, after the discovery of the peril, or under circumstances where he is charged with a knowledge of such peril and being conscious of the inevitable or probable results of such failure.' . . ." (p. 374.)

Our opinion then continues:

"The duty there referred to, the disregard of which amounts to wantonness, is manifestly that which arises only when the person charged with dereliction had knowledge of the danger or of the facts which impute that knowledge to him. . . . Although what is really reckless and wanton misconduct is sometimes spoken of as gross negligence, the expression is everywhere recognized as inaccurate and unfortunate, because it seems to imply a difference only of degree. . . . For the same reason the phrase 'reckless and wanton negligence' has a misleading tendency. One who is properly charged with recklessness or wantonness is not simply more careless than one who is only guilty of negligence; his conduct must be such as to put him in the class with the willful doer of wrong. The only respect in which his attitude is less blameworthy than that of the intentional wrongdoer is that instead of affirmatively wishing to injure another he is merely willing to do so. The difference is that between him who casts a missile intending that it shall strike another and him who casts it where he has reason to believe it will strike another, being indifferent whether it does so or not." (p. 189.)

In *Senning v. Interurban Railway Co.,* 101 Kan. 78, 81, 165 Pac. 863, the court quotes from *Railway Co. v. Baker,* as we have heretofore done, and also the following:

"'Nor is it enough that they know some one might be in the place of danger; the probability must be so great—its obviousness to the employees so insistent—that they must be deemed to realize the likelihood that a catastrophe is imminent and yet to omit reasonable effort to prevent it because indifferent to the consequences.' (p. 187.)" (p. 81.)

In *Fabac v. St. Louis & S. F. Rly. Co.,* 119 Kan. 58, 63, 237 Pac. 1019, it was said:

"If the cause of action be failure to exercise such reasonable care as would be expected of an ordinarily prudent and careful person under the circumstances, the petition must exhibit it. If the cause of action be wantonness,

the petition must exhibit wantonness. This results from the distinction between negligence and wantonness recognized in *K. P. Rly. Co. v. Whipple,* 39 Kan. 531, 18 Pac. 730, and fully elucidated in the Baker case, *supra,* which is a leading authority on the subject. According to the Baker case, failure to exercise due care toward one discovered in a position of peril is not wantonness; it is negligence; that is, it is failure, without purpose or equivalent of purpose, to injure, to use diligence, to act quickly, to employ means which might have been employed to avert injury. To constitute wantonness toward one discovered to be in a position of peril there must be will to injure, or there must be such indifference to consequences, with realization that catastrophe is imminent, as to amount to willingness to injure."

See, also, *Bazzell v. Atchison, T. & S. F. Rly. Co.,* 133 Kan. 483, 486, 300 Pac. 1108.

Considering the above: In what sense did the legislature use the words "gross and wanton negligence" in the statute under consideration (R. S. 1931 Supp. 8-122b)? We are forced to the conclusion the words are used in the sense of wantonness as distinct from negligence, as that distinction is made in former decisions of this court, notably *Railway Co. v. Baker* and allied cases, *supra.* With the three classes of conduct furnishing ground for liability when injury results—negligence, wantonness, willful injury—and with the purpose of the legislature to relieve operators of automobiles from some liability to guests, the statute would be ineffective to accomplish its purpose if it did not relieve from liability for negligence. The statute would be ineffective, also, if the liability from which it relieved operators of automobiles were reëstablished by the use of exaggerated terms to describe negligence.

Let us now examine this record to see if the jury found wantonness of defendant to support its general verdict. The testimony contained two stories as to how defendant's car came to collide with the culvert, and there was some evidence tending to weaken, perhaps, each of them. From all this the jury found, in answer to special question No. 7, that defendant was guilty of gross and wanton negligence. When asked, in question No. 8, to state of what this gross and wanton negligence consisted the jury answered: "Driving recklessly. Failure to have his car under proper control." The real question arises: Is this a finding of anything more than negligence? Certainly the failure to have a car under proper control is nothing more than negligence. In support of the judgment of the trial court counsel for appellee stress the words, "driving recklessly," and point out that recklessness frequently is an element of

wantonness, and under the facts considered in some cases has been said to be synonymous with wantonness. But counsel overlook other uses of the term. In 53 C. J. 549, defining "reckless," it is said:

"The word has a wide range of meaning, that may vary in color and content according to the circumstances and the time in which it is used. . . . In broad sense 'reckless' may be used as synonymous with 'careless,' 'heedless,' 'inattentive,' 'inattentive to duty,' 'indifferent,' 'neglectful,' or 'negligent,' or as implying carelessness, heedlessness, indifference, mere inattention to duty, negligence, thoughtlessness, or want of care. . . . Some cases hold that the term implies more than carelessness, that it implies willfulness, and is equivalent to 'willful.' In this sense the term may be used as meaning desperate; desperately heedless, as from folly, passion, or perversity; destitute of heed or concern for consequences; foolishly heedless of danger; headlong; impetuously or rashly adventurous; indifferent to consequences; mindless; not caring or noting; not recking of consequences; rash; rashly, indifferently, or very negligent; regardless of consequences; utterly careless or heedless; wanton."

If there is any question in which sense the jury used the words "driving recklessly" in its answer, the jury explained and limited its meaning by making as a part of its answer: "Failure to have his car under proper control." This makes it clear that the jury used the term only in the sense of failure to use due care, which is nothing more than negligence.

Counsel for appellee argue throughout that on the return from Wellington defendant had undertaken to make love to plaintiff and had been repulsed repeatedly; that he conceived the device of having her write her telephone number and address for him, and that while she was busily occupied with doing so, and thus not in a position to ward off his attack, he took both hands from the steering wheel of the automobile, permitting it to run without guidance, and engaged in a struggle with plaintiff to embrace her. Had the jury found that to be true we would have had a different question before us. (*Lauson v. Town of Fond du Lac,* 141 Wis. 57, 123 N. W. 629; *Rog v. Eltis,* 269 Mass. 466, 169 N. E. 413; *Brainerd v. Stearns,* 155 Wash. 364, 284 Pac. 348.) But the jury did not find it, but did return an answer which discloses that what was done amounts to nothing more than negligence.

After this answer was permitted to stand by the court, defendant moved for judgment in his favor on the answers to special questions notwithstanding the general verdict. This motion should have been

sustained. In actions in which wantonness must be shown to justify recovery for plaintiff, this court has repeatedly reversed judgments, or directed judgments, when wantonness was not shown or found. (*C. B. U. P. Rld. Co. v. Henigh*, 23 Kan. 347; *K. P. Rly. Co. v. Whipple*, 39 Kan. 531, 18 Pac. 730; *K. C. Ft. S. & G. Rld. Co. v. Kier*, 41 Kan. 671, 21 Pac. 770; *Campbell v. K. C. Ft. S. & M. Rld. Co.*, 55 Kan. 536, 40 Pac. 997; *Railway Co. v. Cooper*, 57 Kan. 185, 45 Pac. 587; *Railway Co. v. Lacy*, 78 Kan. 622, 97 Pac. 1025; *McCullough v. Railway Co.*, 94 Kan. 349, 146 Pac. 1005.)

The judgment of the court below is reversed with directions to enter judgment for defendant.

BURCH, J. (dissenting): It seems to me the majority opinion disregards two fundamental principles governing consideration of special findings of a jury: First, findings are to be harmonized with each other when that may be done; and second, findings are to be harmonized with the general verdict when that may be done. Therefore, to apprehend the meaning of a special finding, the finding itself, related findings, and the general verdict, are to be considered together, to uphold and not to destroy.

The statute is properly interpreted in the majority opinion. Between negligence causing injury and intentional infliction of injury there is a kind of conduct involving an attitude of the wrongdoer differing, not in degree but in quality, from negligence. The attitude involves such culpability that punitive damages may be awarded, and contributory negligence is no defense; and so it affiliates closely with intention and willfulness. This was the kind of conduct the legislature intended to cover. To make its will known, the legislature was obliged to use descriptive words. It went to the morass of words, created by the courts, in which meaning bogs, and selected such of them as seemed expressive. The words chosen were not the best, but by employing the usual interpretative aids, .what the statute did becomes plain.

The question here is, Did defendant's conduct lie within the field which has been referred to? The jury was interrogated on the subject. The jury said the defendant was guilty of just what the statute spoke of—gross and wanton negligence. When asked to specify, the jury said defendant was guilty of reckless driving. The driving was the concrete conduct, and the manner of driving was described. It was reckless. Further specifying, the jury put its finger on the

precise feature of the driving which it had said was reckless and wanton—failure to have the car under proper control.

The general verdict settled conflicts in the evidence, resolved discrepancies in accounts of the accident and other portions of the testimony, and is to be regarded as based on whatever substantial testimony there may be tending to sustain it. The whole case depended on what defendant was doing when the accident occurred. Was he driving, or doing something else? The general verdict rejected defendant's story of the man in the road as an exculpatory invention, and rejected defendant's account of his conduct. The general verdict found that, while driving in the nighttime at a rate of speed which, whether fifteen or forty miles an hour, required proper control of the car, defendant abandoned the steering wheel, took advantage of plaintiff's inability to resist, and tried to hug and kiss her. Released from control while the amatory enterprise was in progress, the car veered to the side of the road and crashed against the culvert post. That is the particular lack of control to which the jury referred. This lack of control of the car made the driving reckless, and the reckless driving constituted gross and wanton negligence. The majority opinion does not indicate that the question was not one for the jury. The opinion is predicated on the view that what the jury did was to declare in effect that defendant was just careless.

In reducing the findings from "gross and wanton negligence" to mere lack of due care, a syllabus is made about what the word reckless may mean, and it is said the word may imply nothing more than negligence. The question is not what the word reckless may mean, but what the jury meant. Just before the word reckless was used, wantonness had been expressed. It so happens Webster's International Dictionary defines the word wanton by the word reckless, and in the case of *Bordonaro v. Senk*, 109 Conn. 428, Chief Justice Wheeler, speaking for the court, said: "Wanton misconduct is reckless misconduct." (p. 431.) When the jury were asked to tell in what the wantonness consisted, the answer was it consisted in reckless driving, and there is no basis for a conclusion that the jury intended to minimize or did minimize wantonness by saying it consisted in recklessness; and if, as the syllabus states, the word reckless may be a descriptive term implying wantonness, the findings are to be read as if wantonness and recklessness were synonymous to the jury.

The terms reckless and wanton have both been used to describe the kind of conduct lying between negligently harmful conduct and conduct intentionally harmful. In case of death as a result of such conduct, the conduct is punishable criminally as manslaughter at the common law. (*State v. Custer*, 129 Kan. 381, 282 Pac. 1071.) In that case, in getting at the kind of conduct punishable criminally, just as in this case we get at the kind of conduct which may be the basis of a cause of action, this court chose the word reckless. It was said the word is not an epithet, but is a descriptive adjective, and a working, general definition of the word was framed:

"To be reckless, conduct must be such as to evince disregard of or indifference to consequences, under circumstances involving danger to life or safety of others, although no harm was intended." (p. 395.)

Tautology and loose phraseology breed confusion in the law. In restating the law of torts the American Law Institute discriminated the kind of conduct covered by the statute involved in this case, and out of the welter of words and phrases which had been used by the courts to describe it, chose the words "reckless conduct." (Restatement Torts [Tent. Draft No. 10] § 18, Approved, Annual Meeting May, 1933.) The word wanton has a specific meaning of lewdness, and is otherwise not quite so accurate for the purpose as reckless; and the writer respectfully submits that conduct recklessly disregardful of the safety of others may not be regarded, either by sound judicial opinion or by competent lay opinion, as implying nothing more than negligence.

SMITH, J., concurs in this dissent.

HUTCHISON, J., not sitting.