No. 36,969

OTILLIA M. SRAJER, Administratrix of the Estate of Frank W. Srajer, Deceased, *Appellant*, v. JOE SCHWARTZMAN (sometimes written as Joseph Schwartzman), *Appellee*.

(188 P. 2d 971)

Opinion filed January 24, 1948.

*John E. Wheeler,* of Marion, argued the cause, and was on the briefs for the appellant.

*George B. Powers,* of Wichita, and *Kenneth L. Hodge,* of McPherson, argued the cause, and *Robert C. Foulston, George Siefkin, Andrew F. Schoeppel, Samuel E. Bartlett* and *George B. Powers,* all of Wichita, and *Braden C. Johnston,* of Marion, were with them on the brief for the appellee.

The opinion of the court was delivered by

HOCH, J.: This was an action by a widow to recover damages for the wrongful death of her husband in an automobile accident. He and another man were riding in a coupé being driven by the defendant when the accident occurred. The plaintiff appeals from orders sustaining a demurrer to her evidence and overruling her motion for a new trial. Her principal contentions are that the trial court erred, first, in holding that there was no evidence indicating a joint venture as to use of defendant's car; that the guest statute (G. S. 1935, 8-122b) was applicable and that no "gross and wanton negligence" was shown; second, in refusing to reopen the case for additional testimony; third, in admitting and in excluding certain evidence.

The fatal accident which occurred on November 24, 1944, was witnessed, so far as the record shows, only by the three occupants of the car, the defendant, Joe Schwartzman, Frank Srajer (deceased), and a man named Ucker. At the time of the accident the car was proceeding northward a few miles northeast of Ramona, Kan. After the accident, the car was found in the ditch on the west side of the road lying on its side some distance north of a concrete bridge and apparently had collided with a concrete railing on the west side of the bridge. The deceased, Frank W. Srajer, was in the wrecked car and appeared to be dead when the first witnesses arrived after the accident. In a deposition admitted upon the hearing on the motion for a new trial, Earl Ucker, the third occupant of the car, stated that he was sitting on the outside and Srajer was sitting in the middle, while the defendant Joe Schwartzman

was driving. Both Schwartzman and Ucker were injured and Ucker was taken to the hospital for treatment by the ambulance which arrived from Herington some time after the accident.

In her petition, plaintiff alleged that the highway and bridge in question were broad and in good condition for travel and that the defendant was familiar with the road and the bridge; that some time prior to the accident the defendant and the deceased entered into a verbal business arrangement for the transportation of some cattle by truck from their farms in what is commonly known as a "mixed load of cattle"; that they had agreed to this arrangement for the purpose of trucking their cattle to the Herington Sales Pavilion for their mutual benefit in the cost of transporting the cattle and for the purpose of effecting a sale of the cattle; that in pursuance of this oral contract they did load a mixed load of cattle into a truck owned and operated by Ted Haefner and that after the cattle were loaded and for the purpose of supervising the division and sale of their cattle at Herington and for the purpose of arriving at the sales pavilion, they got into a coupé owned and operated by the defendant; that for the purpose of further carrying out the oral arrangement, the defendant agreed to convey Srajer in his car from Srajer's farm to Herington and that by reason thereof, the defendant benefited in that he was able to and did thereby secure a cheaper rate for trucking his cattle to Herington; that after Srajer took passage in defendant's coupé, which was then being operated by and under the control of the defendant, the defendant "who was then and there under the influence of intoxicating liquor" and while he was so intoxicated as to be unable to properly operate said automobile "did willfully, wantonly and recklessly, and with an indifference to consequences" drive the car at an excessive speed, namely between sixty and seventy miles an hour, and that at all times pertinent hereto defendant "was not maintaining or keeping a proper lookout," and that while so driving his car willfully, wantonly and carelessly and while in an intoxicated condition and without keeping a proper lookout, he ran the car into the west side of the concrete railing on the bridge "when he saw and could have seen the bridge"; that the defendant was driving the car at such a fast and dangerous rate of speed that when it collided with the bridge it rolled over and over along the west side of the road for a distance of 105 feet colliding with and shearing off a cottonwood tree, and then rolled an additional distance of between 25 and

40 feet into a hedge-fence post tearing off the post and tearing down the fence; that as a result of said collision the car was completely demolished; that as a result of the operation of the car as heretofore stated, Srajer was thrown with great force and violence against the sides and top of the automobile receiving thereby wounds, cuts and contusions in and about his head, face, neck and body, and the severance of an artery; that Srajer was also internally injured, plaintiff being unable to state the exact nature thereof; that he bled profusely and suffered from the shock and that the defendant knew and it was apparent that Srajer was then in an unconscious condition from these injuries and was in need of the help of doctors and of hospitalization; that notwithstanding the critical condition of Srajer, the defendant willfully, wantonly, carelessly and negligently failed to render reasonable assistance to him; failed to make arrangements for taking Srajer to a physician or hospital for treatment and failed to summon a doctor or other person to care for Srajer although it was then apparent that such treatment was necessary in Srajer's unconscious and critical condition; that Srajer died as a result of this willful, wanton and negligent conduct on the part of the defendant. The prayer was for judgment in the sum of ten thousand dollars. In a second cause of action, plaintiff repeated substantially the allegations heretofore recited and prayed for judgment in the sum of $839.47 to cover funeral expenses. Defendant's answer consisted in the main of a general denial, with specific denial of any business arrangement between the deceased and the defendant, or that the defendant received any consideration for transporting the deceased. Defendant further averred that Srajer was riding in the car as a guest of the defendant and that negligent acts of the deceased directly contributed to and caused his death. In answer to the second cause of action the defendant alleged that since the maximum that could be allowed under Kansas statute for wrongful death is ten thousand dollars, plaintiff's action as to her second cause of action must fail. The reply was a general denial.

At the conclusion of plaintiff's evidence, defendant demurred. In ruling upon the demurrer the trial court properly gave first consideration to the question of the capacity in which the deceased was riding in defendant's car. The appellant contended and contends here that they were engaged in a joint venture or enterprise and that for that reason a showing of ordinary negligence was suffi-

cient to take the case to the jury. The appellee's contention was and is that there was no showing of joint enterprise as to the transportation of the deceased in defendant's car; that the deceased was a guest passenger and that there was no showing of "gross and wanton negligence" which is necessary to be shown in order to establish liability under the guest statute. (G. S. 1935, 8-122b.) Commenting upon this question, the trial court said in part:

"If the deceased was not a guest and this was a joint enterprise, then the question would arise as to whether or not a showing of ordinary negligence has been made. . . . The only testimony we have upon that subject is the fact that these men owned a mixed load of cattle which went to the Herington Sales Pavilion. They did not own the cattle jointly. Each one owned the particular head of cattle which came from his farm, and there never was any question in this case of there being a joint ownership, so that the *joint enterprise, if it existed, consisted only of the transportation of those cattle.* . . . I think unquestionably there has not been a sufficient showing to take the matter to the jury upon the question of the joint enterprise. That being the case, it is apparent that the guest statute applies." (Italics supplied.)

Reviewing the evidence, the trial court found that the circumstances attending the accident were sufficient to establish a prima facie case of "ordinary negligence" but not of "gross negligence," and accordingly sustained the demurrer. Plaintiff's motion for a new trial was overruled and this appeal followed.

We first consider defendant's demurrer to the evidence. In harmony with the elementary rule, repeatedly stated, we shall, in testing plaintiff's evidence as against the demurrer, consider only that which is favorable to her, together with all favorable inferences to be reasonably drawn therefrom. (*Greep v. Bruns,* 160 Kan. 48, with cases cited, p. 56, 159 P. 2d 803. See, also, many cases cited Hatcher's Kansas Digest, Trial, ¶¶ 147 to 151, incl.) The principal questions are whether there was substantial evidence of a joint venture sufficient to make the guest statute inapplicable and, if not, whether the plaintiff's evidence presented a prima facie case of "gross and wanton negligence."

Desiring to ship some cattle to market, the defendant Schwartzman made some arrangement for trucking them and later, perhaps the following day, Srajer (the deceased) also decided to ship some of his cattle. Schwartzman's cattle were more than enough to fill one load, and an arrangement was made with a man named Haefner to load the rest of his cattle, together with Srajer's cattle in a truck for hauling to the sales pavilion at Herington. There was no joint

ownership in the cattle. There was no direct evidence that the transportation cost of hauling the cattle in the mixed load was less to either party than it would have been if they had been hauled in separate trucks. Appellant urges that the trial court erred in excluding testimony that, by common custom and practice, a full load of cattle is ordinarily hauled at a lesser rate per hundredweight than a partial load. For present purposes we shall assume that the testimony was admissible, and indulge a presumption that both parties benefited by the arrangement. Also, although there was direct testimony to the contrary, we shall indulge in plaintiff's favor an inference from testimony admitted that each party needed to be at the sales pavilion in order to supervise the separation and sale of his cattle. Assuming, however, that there was a joint venture in transporting the cattle in the mixed load, we must agree with the trial court that there was no evidence which tends to show that the deceased was other than a voluntary guest in the defendant's car. There was no evidence of any agreement on the part of the defendant to take the deceased to Herington as a part of the arrangement in connection with transporting the cattle. There was no evidence that the defendant was under any obligation to transport Srajer to Herington or that it was of any benefit or advantage in any way to him to do so. When the cattle had been loaded in Haefner's truck, Srajer got into the truck with Haefner and was riding with him when the defendant, accompanied by Ucker, drove up alongside and honked his horn. Srajer asked Haefner to stop and then voluntarily got out of the truck and into the car with the defendant and Ucker. He could have gone on for the few miles to Herington in the truck and been there to supervise the unloading of the cattle. However, he voluntarily transferred to defendant's car. We agree with appellant's contention that payment for transportation in money is not necessary in order to keep a passenger from being a guest passenger, within the meaning of the statute. But there must be substantial consideration of some sort moving to the operator or owner of the vehicle.

Our guest statute, G. S. 1935, 8-122b, enacted in 1931, reads in part as follows:

"That no person who is transported by the owner or operator of a motor vehicle, as his guest, without payment of such transportation, shall have a cause of action for damages . . . unless such injury . . . shall have resulted from gross and wanton negligence . . ."

In *Stout v. Gallemore*, 138 Kan. 385, 26 P. 2d 573, decided soon after the enactment of the statute, the legislative purpose of this and similar statutes was discussed, the statute broadly construed, and many cases cited in support of the construction given. We need not here go over the same ground at any length. In the opinion it was said:

"This statute is the outgrowth of a thought which had become common among our people, that it was too easy under our law relating to liability for negligence for one riding in an automobile as a guest of the driver to recover damages for injuries sustained in an automobile casualty." (p. 389.)

In *Pilcher v. Erny*, 155 Kan. 257, 124 P. 2d 461, we gave consideration to the question of who is a guest within the meaning of the statute. The action in that case was against the driver of the car in which the plaintiff was riding when she was injured. The defendant had brought a leather coat to the plaintiff for repair and she had made a charge of $1.25 for doing the repair work. Later the defendant asked the plaintiff, who lived at Hutchinson, if she wanted to go to Stafford, and she said that she did, and when he called for the coat and offered to pay for it, she said that she would let the charge for repairing the coat go on the expense of the trip to Stafford. The defendant replied that she didn't owe him anything, that he was going to Stafford anyway and would take her and her son along. She replied that she didn't want it that way as she preferred to pay her own expenses, and he in turn replied that if that was the way she felt about it, it was all right. In spite of this element of consideration, it was held that the plaintiff was a guest within the meaning of the guest statute. In the opinion it was said:

". . . giving the plaintiff the benefit of all reasonable inferences to be drawn from her evidence, we have concluded that the arrangement between herself and defendant as to payment for repairing the coat *was only incidental* to the business for which he was making the trip to Stafford and beyond. There had been talk about plaintiff going as far as Stafford with him before he brought the coat in to be repaired. There can be no doubt that he would have gone there anyway, regardless of any arrangement with plaintiff. G. S. 1935, 8-122b, was enacted to make it more difficult for guests to recover damages from their hosts on account of injuries sustained in automobile wrecks. It would not do to exempt carriers for hire from liability for such damages, so the provision making an exception in cases where the guest paid for his transportation was written into the statute. The intention was, however, that *the exception should apply only where the payment was the chief motivating cause for the trip or carriage,* not to a case such as we have here where the trip would have been made in any event by the driver of the car, and the

plaintiff was in the car, in the main, on account of a desire on the part of the defendant to be accommodating and to extend the hospitality of his car to her and her son." (Italics supplied.) (p. 260.)

This question was reviewed in *Vogrin v. Bigger,* 159 Kan. 271, 154 P. 2d 111, and the rule stated in *Pilcher v. Erny* was reaffirmed. Without reciting in detail the facts of that case, it may be said that the plaintiff contended that although he may have been a nonpaying passenger when the trip started, his status changed during the course of the trip to that of a person being transported for a consideration, as a result of an agreement to help the driver and his principal secure a purchaser for a farm while on the trip. We rejected the contention, saying:

". . . that *the chief motivating reason for his being in the car on the trip was not upon any payment of consideration therefor;* that under his evidence he did not continue on the trip by reason of his agreement to perform any service for Rankin or his alleged principal, but that he was a passenger in the car merely on account of defendant Rankin's extending to him the hospitality of a ride." (Italics supplied.) (p. 275.)

We conclude that the trial court correctly found that there was no evidence that when Srajer decided to ride with the defendant, it became a joint venture which would make the guest statute inapplicable.

We come to the question of whether the evidence made a prima facie case of "gross and wanton negligence" necessary to be shown under the guest statute. The words "gross and wanton negligence" as used in the guest statute have been definitely and repeatedly construed by this court. Although, as stated in *Stout v. Gallemore,* supra, page 389, the words "gross and wanton negligence" were not especially well selected in the drafting of the act, the legislative purpose is clear. As was there stated, wantonness is not, strictly speaking, mere gross negligence. It differs from negligence not merely in quantity but in quality. In this state we do not recognize the classification of negligence into the degrees of slight, ordinary and gross. (*Railway Co. v. Walters,* 78 Kan. 39, 96 Pac. 346.) The test of liability is simply whether due care was exercised under all the circumstances existing. A full discussion of this matter will be found in *Stout v. Gallemore,* supra, with many cases there cited and analyzed. See, also, *Cohee v. Hutson,* 143 Kan. 784, 57 P. 2d 35, and *Anderson v. Anderson,* 142 Kan. 463, 465, 50 P. 2d 995.

In order to effectuate the clear purpose of the statute, we have

construed the words "wanton negligence" to mean wantonness, or wanton and willful conduct. This question was again thoroughly reviewed in *Frazier v. Cities Service Oil Co.*, 159 Kan. 655, 157 P. 2d 822. Syllabus 5 of that case reads:

"To constitute wantonness, the acts complained of must show not simply lack of due care, but that the actor must be deemed to have realized the imminence of injury to others from his acts and to have refrained from taking steps to prevent the injury because indifferent to whether it occurred or not. If the actor has reason to believe his act may injure another, and does it being indifferent to whether it does or not, he is guilty of wanton conduct."

In the recent case of *Leabo v. Willett*, 162 Kan. 236, 175 P. 2d 109, the appeal was here upon demurrer to the petition. In the petition it was alleged:

"That the road or highway upon which said automobile was being operated by the said William E. Willett at the time said accident occurred was an *unimproved dirt highway with crooked wheel ruts or tracks therein, which were approximately eight (8) to ten (10) inches deep*. That said accident was the legal result of the gross and wanton acts and misconduct of the said William E. Willett in driving said automobile over said deeply rutted road or highway *at a dangerous and excessive rate of speed, to wit: 65 to 70 miles per hour.*" (Italics supplied.) (p. 237.)

The order of the trial court sustaining the demurrer was affirmed and in the opinion it was said:

"In order to render the operator of a vehicle liable in damages under our guest statute his conduct must be such as to denote conscious or intentional misconduct from which injury to someone is likely to result and with a reckless disregard of such consequences. (*Stout v. Gallemore,* 138 Kan. 385, 26 P. 2d 573; *Sayre v. Malcom,* 139 Kan. 378, 379, 31 P. 2d 8; *Ewing v. Edwards,* 140 Kan. 325, 326, 36 P. 2d 1021; *Aduddell v. Brighton,* 141 Kan. 617, 42 P. 2d 555; *Murrell v. Janders,* 141 Kan. 906, 44 P. 2d 218; *Anderson v. Anderson,* 142 Kan. 463, 50 P. 2d 995; *Cohee v. Hutson,* 143 Kan. 784, 57 P. 2d 135.)" (p. 238.)

It was noted in the opinion in that case that in the Sayre case, cited, it was held that an allegation that the defendant while driving his car took his eyes off the road when about 75 feet from a culvert and "continued to drive his car at a high rate of speed," striking the culvert, constituted nothing more than an allegation of negligence, of lack of due care.

In the Murrell case, also cited in the Leabo case, it was alleged that the defendant was traveling at a speed of 60 to 70 miles per hour, with knowledge of the dangerous conditions he was encountering, but it was held that the petition stated a cause of action for negligence only.

Testing plaintiff's evidence by the rule clearly established by the cases above cited and others, the trial court found no evidence which tended to show "gross and wanton negligence" within the meaning of the statute. Our careful examination of the record compels us to reach the same conclusion.

The deceased and defendant were friends and there was nothing to suggest any ill will between them. There was no common or joint ownership of the cattle and, as far as the evidence indicates, their mutual arrangement related solely to transportation of the cattle. No benefit or advantage accrued to the defendant when Srajer voluntarily got out of the cab of the cattle truck in which he was riding, and into defendant's car.

As far as the record shows, no one knows what caused the accident. In the petition it had been alleged that the car was traveling at between 60 and 70 miles an hour; that the defendant did not keep a proper lookout and that he was intoxicated. There was no testimony as to the speed the car was traveling and none as to failure to maintain a lookout. It is true that the lips of the deceased were closed as to these matters, but Ucker, the third passenger in the car, was available as a witness by way of deposition, and his deposition was taken.

A witness, Gooding, testified that he saw the Schwartzman car going north at about 1:00 o'clock on the day of the accident, but testified that he did not know who was in the car. He was asked how fast the car was traveling but, upon objection, was not permitted to answer, the trial court remarking: "Well, you haven't got anybody in that car that had any connection with this case." Another witness, Rhodes, who lives at Tampa, testified that he saw Schwartzman come out of a restaurant at Tampa at about 1:30, or perhaps later, on the day of the accident, and saw him get into a car and back away from the curb, but "did not know in which direction they went." Appellant says that if this witness had been permitted to answer, he would have testified "that at that time this car was being driven in a northerly direction at a high rate of speed through the streets of Tampa." The witness had already testified that he did not know in which direction the car was going. Moreover, the record here does not disclose that he was asked at what rate of speed the car was traveling. Nor do we find that on the motion for a new trial any offer was made showing what the testimony of any witness would have been as to speed, if permitted to testify concerning

it. And it is not claimed that any witness called had any knowledge as to the speed the car was traveling when the accident occurred.

It may properly be argued that the facts and circumstances shown in connection with the accident would indicate a rather high rate of speed but no testimony was offered as to what speed was thus indicated. In any event, a reasonably high rate of speed on an open highway is not, of itself, evidence of gross negligence, much less of wantonness. (*Anderson v. Anderson,* supra, 466, 467.)

On the question of defendant's being intoxicated, there was some testimony, however meager, to support appellant's contention. While none of the other witnesses who had been at the scene of the accident and had talked to the defendant after the accident occurred, testified that he was intoxicated, one witness, R. E. Lee, a young man seventeen or eighteen years old, who had driven the ambulance from Herington, testified that he smelled liquor about the car and that, in his opinion, the defendant was under the influence of alcohol. He later testified:

"Q. See if I understand your testimony: Are you testifying to this jury that when you got out there Joe Schwartzman was drunk? A. No, sir.

"Q. You are not testifying to that, is that correct? A. That's right.

. . . . . . . . . . . . .

"Q. In your opinion was he drunk?

. . . . . . . . . . . . .

"A. That is just my opinion.

"The Court: What is your answer?

"A. I don't know.

. . . . . . . . . . . . .

"Q. (By Mr. Wheeler.) In your opinion and best judgment he was drunk, wasn't he, Mr. Lee?

"Mr. Powers: I object to that as leading and suggestive and argumentative.

"The Court: He just answered that he didn't know.

"Mr. Wheeler: Will you read the question, Mr. Reporter?

(Question read.)

"A. I don't know.

"Mr. Wheeler: Oh, that's all. Step down."

Although the witness thus plainly weakened his own testimony, it must be accepted as some evidence that the defendant was more or less under the influence of liquor. But, of what avail is this to the appellant? The deceased got into defendant's car and rode with him a number of miles to Ramona and there they together went into the restaurant and each drank not to exceed two bottles of 3.2 beer. The deceased then again got into defendant's car and rode with him to the scene of the accident, which was less than two miles

away. If the defendant was intoxicated, and an unsafe driver, the deceased was in a position to know it.

Lastly, appellant contends that the evidence showed that following the accident the defendant gave no attention or care to his injured passenger, thus violating not only his moral and common-law duty, but violating the provisions of our specific statute (G. S. 1945 Supp. 8-520), which makes it the duty of a driver of a vehicle involved in an accident which results in personal injury or death, to give information and to render needed aid and assistance.

The burden was upon the plaintiff to establish defendant's disregard of duty in this regard. Appellant appears to proceed upon the theory that no evidence having been offered that the defendant made any effort to call a doctor or a hospital, or to give any assistance to his injured passengers, that was sufficient to establish a prima facie case that he failed to do so. We cannot accept that theory. Notice of the accident was given by somebody, and ambulance did arrive from Herington some time later, and Ucker, who was quite severely injured, was taken to the hospital. H. F. Brunner, who lived not far from the scene of the accident, testified that he was at the scene about one and one-half hours after it happened, having come in from the field where he was shucking corn. G. H. Brunner, who lived at Ramona, testified that he arrived at the scene of the accident about a half hour after it occurred. R. E. Lee, who drove the ambulance, and Donald Miller, who rode with him, were called as witnesses. In addition to these witnesses, the record discloses that in his opening statement, counsel for the defendant gave the names of various persons, including the telephone operator at Ramona, who would be called, who had knowledge of these matters. While we cannot on this issue give consideration to appellee's assertion that his evidence, if necessary to be offered, would have refuted appellant's contention, the fact remains that the plaintiff apparently made no effort to show, by affirmative evidence, that the defendant failed to give the information or to render the aid required by statute. Witnesses who were there following the accident testified that, in their opinion, Srajer was dead when they arrived.

Appellant urges that the defendant evidenced a rough and unsympathetic attitude, and a lack of distress over the death of Srajer, following the accident, and stresses testimony of the driver of the ambulance that the defendant said, "Why hell, he is dead, there is

a man seriously injured in the other car." However crude and insensitive the defendant, who was also injured, may have shown himself to be following the accident and death of his fellow passenger, such conduct does not make him liable within the issue here presented.

After the demurrer to the evidence had been sustained, and in connection with her motion for a new trial, the plaintiff offered in evidence the deposition of Ucker, the third pasenger in the wrecked car, on the ground that it was newly discovered evidence. It certainly cannot be said to be newly discovered evidence, since the deposition, at the taking of which the plaintiff had been represented, had been on file for six or eight months prior to the trial. The trial court, however, admitted it in support of the motion for a new trial. The particular portion of the deposition to which appellant calls attention was the following:

"Q. Didn't you prior to the time of that accident hear Mr. Schwartzman say in substance that they were going down to the Herington Pavilion to separate out there the respective cattle? A. That is right, yes.

"Q. You did hear Mr. Schwartzman make a statement in substance to that effect? A. That is right, he and Frank."

That testimony goes only to the matter of separation and sale of the cattle and does not establish any consideration for the carriage of Srajer in defendant's car. It does not tend to show that Srajer was not a guest passenger.

Ucker's deposition does, however, throw further light on other questions hereinbefore discussed. He testified, in part, as follows:

"Q. When did you first see Joe Schwartzman that day? A. When?

"Q. When? About what time? A. I suppose around 10 o'clock, I don't know; 11 or 12, I wouldn't know.

"Q. In the morning? A. That is in the forenoon.

"Q. And that was in Tampa, Kansas. A. That is right.

"Q. How did you get to Tampa? A. I rode over there with Ted Haefner.

"Q. Then you got in the car with Joe Schwartzman? A. That is right.

"Q. Where did you go from Tampa with Joe? A. Out and loaded these cattle.

.  .  .  .  .  .  .  .  .  .  .  .  .  .  .

"Q. When you picked Frank up, Frank got out of the truck and into Joe's car, is that right? A. That is right.

"Q. Was there any conversation at that time? A. No.

"Q. Where did you go from there? A. Ramona.

"Q. How were you sitting in the car? A. Well, Joe was driving and Frank in the middle and I am on the outside.

"Q. Did you stop in Ramona? A. Yes.

"Q. Where did you stop? A. Over at—

"Q. Was it Bill Oyster's? A. That is right, Bill Oyster's.

"Q. What did Joe do in Bill Oyster's? A. Well, he called up the sales pavilion at Herington.

"Q. Was that to tell them that his cattle would be late in getting there? A. That is right.

"Q. Did Frank get out of the car? A. Yes.

"Q. At Bill Oyster's? A. Yes.

.   .   .   .   .   .   .   .   .   .   .   .   .   .   .

"Q. Did the three of you drink any beer? A. Yes.

"Q. Frank drank the same? A. Yes.

"Q. And you drank the same? A. That is right.

"Q. And Joe drank the same? A. That is right.

.   .   .   .   .   .   .   .   .   .   .   .   .   .   .

"Q. Do you remember how much each of you drank? A. Yes.

"Q. How much did you drink? A. Two bottles.

"Q. How much did Frank drink? A. Two.

"Q. How much did Joe drink? A. I think about a bottle and a half, or maybe just a bottle.

"Q. All right. Up until this time had any of you drank any whiskey? A. I don't know anything about the rest of the guys.

"Q. Did you see any one of them drunk? A. No.

"Q. Was there anything to indicate that either one of them had drunk any whiskey? A. No.

"Q. All right. All three of you got back into the car, is that right? A. That is right.

"Q. And where did you go from Bill Oyster's? A. Started for Herington.

"Q. And what happened? A. That is what I wish somebody would tell me. We had this accident.

"Q. And in the accident you were injured? A. That is right, and Frank was killed.

"Q. Frank was killed? A. Yes.

"Q. Now, did Joe drive any differently after he left Ramona until the accident than he had been driving—A. No.

"Mr. Hodge: Let me finish the question.

"Q. —than he had been driving from the time that Frank first got into the car until you stopped at Ramona? A. I still say no.

"Q. Was there anything unusual about the mannner that Joe was driving in? A. No.

"Q. Did you criticize Joe as to the way he was driving? A. No.

"Q. Did Frank? A. No.

"Q. Was anything said by anyone as to the speed or the manner in which Joe was driving? A. No.

"Q. Do you remember what your conversation was about on that trip? Were you talking cattle? A. Yes.

"Q. All at once the accident happened? A. That is right.

"Q. Do you know what caused that accident? A. No, I don't know."

Other contentions of the appellant are substantially covered by what has already been said, and require no further comment.

However deep and sincere a sympathy trial and appellate courts may entertain for those bereaved, as was the plaintiff and others by the loss of their loved one in this tragic accident, they have no option, in justice to all, but to interpret and to apply the established law as best they may to the facts presented.

No error is found and the judgment is affirmed.