No. 42,518

JOHN POLZAR, *Appellant,* v. ARTHUR QUINTON RAYMOND, *Appellee.*

(369 P. 2d 373)

Opinion filed March 3, 1962.

*Herbert A. Marshall,* of Topeka, argued the cause, and *Allen Meyers, Doral H. Hawks,* both of Topeka, and *Robert E. Ferguson,* of Marysville, were with him on the briefs for the appellant.

*Charles S. Fisher, Jr.,* of Topeka, argued the cause, and *Philip H. Lewis, James W. Porter, O. B. Eidson, E. Gene McKinney, Frank C. Sabatini,* and

*Roscoe E. Long,* all of Topeka, and *Robert F. Galloway,* of Marysville, were with him on the briefs for the appellee.

The opinion of the court was delivered by

PARKER, C. J.: Plaintiff, a minor, brought this action by his father and next friend to recover damages for personal injuries sustained while riding as a guest passenger in the right front seat of an automobile driven by defendant, Arthur Quinton Raymond. After the plaintiff's evidence was submitted, defendant's demurrer thereto was sustained and plaintiff took an appeal where the sole issue presented is whether the trial court erred in sustaining defendant's demurrer to plaintiff's evidence.

This is one case where there is little, if any, dispute as to the evidence on which the ruling of the trial court must stand or fall. Based on such evidence the general factual picture, as it existed prior to and at the moment of the accident, may be stated thus.

On the evening of March 31, 1958, plaintiff and five other young men were riding together in a 1954 Ford automobile driven by defendant in the town of Frankfort. While stopped at a Standard Oil Service Station in that city the occupants of the automobile discussed whether they would go to Seneca or to Olsburg. Ultimately they agreed to go to Olsburg to attend a dance and finally decided they would go south along K-99 until they reached Blaine, a distance of fifteen miles, and then take K-16 west to Olsburg. While the young men were stopped at the Standard Service Station, they discussed the road K-16 west from Blaine and mentioned in the presence of defendant that the road had sharp curves and hills.

While traveling south on highway K-99 to Blaine there were no objections to the manner or style of defendant's operation of the automobile. Defendant was going sixty-five to seventy miles per hour. However, all occupants of the automobile, including the plaintiff, testified that defendant was not driving too fast; that no guest asked or suggested that defendant slow down; and that no one commented or said anything about the manner in which he was driving. Again, while traveling south to Blaine, there was some discussion about K-16 west from Blaine to Olsburg, concerning its characteristics or nature, it being discussed in the conversation that K-16 had sharp curves and hills but thereafter no occupant of the automobile protested or complained about the rate of speed at which defendant was driving.

Upon turning west from Blaine, the young men traveled approximately one-half mile west on K-16 at which time the car was stopped, for some unexplained reason, and all occupants got out of the automobile. Thereafter, they re-entered the motor vehicle and proceeded west, with the defendant driving and the plaintiff sitting next to the door in the right front seat of such vehicle.

After traveling approximately one and one-half miles farther west on K-16, at about sixty-five to seventy miles per hour, the automobile proceeded down a fairly sharp incline, started up hill, and then encountered a ninety-degree turn to the south. At this point, while negotiating the turn and after a tire blew out, the defendant driver lost control of the automobile and it rolled over one and one-quarter times. Plaintiff sustained severe and permanent injuries in the accident.

Specifically, the plaintiff, John Polzar, who testified as a witness in his own behalf, made, among others, the following statements and admissions: That it was dark at the time the accident happened; that he was riding in the right front seat beside the door; that he knew the defendant's family had owned the car for only a couple of weeks; that the car was in good operating condition as far as he knew; that he knew of no defects in the car; that the defendant had his headlights on; that he didn't see any warning or speed signs; that neither he nor anyone else complained of the manner that defendant was driving; that he was in a position to see things as they happened; that it was about two tenths of a mile, or about 350 yards down the hill, before the curve began; and that then you go down approximately 210 to 280 yards and the road levels out and starts up again.

In addition plaintiff was asked questions, to which he made response, as follows:

"Q. Can you tell the jury when the curve was first apparent to you. When did you first see the curve was there? A. When we started sliding.

"Q. And by that time Quint already had the brakes on? A. He had the brakes on.

"Q. Then he saw it before you did? A. I don't know just when he seen it. All I know is when the brakes went on.

"Q. As a matter of fact, as that road is situated there it's impossible to see the curve at night in your headlights until you start up the upgrade, isn't that right? A. Well now it could be, yes. I wouldn't say for sure.

"Q. As you start up the upgrade you are right on top of the curve, is that right? A. As you start up the upgrade, right out there is the curve.

"Q. Where were you with reference to starting up that upgrade when Quint applied the brakes? A. Now I couldn't say for sure.

"Q. What is your best recollection? A. We had just started into the curve as far as I know.

"Q. As a matter of fact, you were just going up the upgrade, weren't you? A. We had just started into the curve. You go down the hill and you head up the upgrade and it was just as you start into the curve.

"Q. There hadn't been any trouble in negotiating any curves before this place where the accident happened, had there? A. Not that I recollect.

"Q. There hadn't been any wild or foolish driving on the two hills prior to that, had there, sir? A. No.

"Q. Had there been anything that caused you alarm or made you apprehensive prior to the time the accident occurred? A. Not that I know of.

"Q. All right. As I understand your testimony, what caused the accident was just going into that curve too fast, is that right? A. As far as I know, yes.

"Q. Was there anything else. A. Not that I know that happened that night."

Roger Taylor, another passenger in the automobile, also testified as a witness for the plaintiff. In substance he stated that he knew defendant had not been over the road before; that he had been over the highway and knew its general condition; that he knew it had sharp curves in it, and some bad hills; that they were driving sixty-five miles per hour until they came to the curve; that he remembered the discussion about the condition of K-16 but that he didn't remember where the discussion took place; that the road was dry; that it was a clear night; that the car slowed to about fifty-five miles per hour as it started up the incline and before reaching the curve.

Testifying about what happened as they reached the curve, Roger Taylor was asked questions, to which he made answers, as follows:

"Q. What warning did Quinton have that that curve was there? A. Just when we went down and started up again.

"Q. And at what point was this curve first visible to you—at the point where you started up? A. That is right.

"Q. And at what point did he apply the brakes? A. He applied them when he started up again.

"Q. In other words, then the first time he could see the curve he applied the brakes, did he? A. That is right.

"Q. There has been some question about a blowout on that car. Roger, did a tire blow out on that car? A. It definitely did.

"Q. Do you remember it blowing out? A. Yes, I remember he was sliding. The car dipped down—I mean it was just a small thump thump.

"Q. All right. Now did that occur before or after the car turned over? A. Before—when he was in the slide.

"Q. Was there ever any conversation or any comment directed to Quint to drive slower, or there is a curve ahead, or anything of that nature? A. No. I know I felt safe in the car.

"Q. All right. Did you feel safe up until the time the accident happened in the car? A. Yes I did."

Norbert Bramlage, another passenger in the automobile, testified in substance that when they started along K-16 they were going sixty to sixty-five miles per hour in his judgment; that up until the accident happened he at no time worried about the way the defendant was driving or felt he was in danger or anything of that nature; that he felt perfectly safe; that no one protested or made any objection as to the manner in which the car was being driven; that the first time he knew the curve was there was when the car started up the incline; that at that time the defendant had slowed up some; that their speed at the time they reached the curve was between fifty-five and sixty miles per hour; that the car was skidding along sideways before it turned over; that the tire either "blew out" or "popped off" the rim, and that it could have popped off from the sideways skid.

The only other passenger to testify was Gale Randall, who was sitting in the front seat at the time of the accident. He testified in substance that the defendant was driving at a speed of sixty-five miles per hour at the time the car got to the curve; that when the lights "hit" the curve, the defendant "hit" his brakes; that the car was going too fast and when it got to the curve it started sliding and the right back tire "it seemed like dropped down" and the car overturned; that before they reached the curve there was nothing about defendant's method or manner of driving which bothered him and there was nothing that caused him or any one else to protest or complain about his driving; that he felt perfectly safe; and that he thought the defendant saw the curve just as soon as it could be seen.

In the face of evidentiary facts, such as have been heretofore related, the over-all question raised by plaintiff, who concedes he was a nonpaying guest passenger at the time of the accident in question, is that the trial court erred in holding his evidence was insufficient to establish "gross and wanton negligence" on the part of the defendant and therefore failed to establish a cause of action against defendant under the guest statute (G. S. 1949, 8-122b), which reads:

"That no person who is transported by the owner or operator of a motor vehicle, as his guest, without payment for such transportion, shall have a cause of action for damages against such owner or operator for injury, death or damage, unless such injury, death or damage shall have resulted from the gross and wanton negligence of the operator of such motor vehicle."

Specifically, all contentions advanced by plaintiff in support of

his position on the point now under consideration are based upon the premise that the rate of speed at which defendant was driving immediately prior to the accident, coupled with the fact there had been some prior conversation between all occupants of the automobile as to the characteristics and nature of the roads to be traveled en route to Olsburg, convicted defendant of gross and wanton negligence and thus established a cause of action against him under the guest statute. Let us see.

The terms "gross and wanton negligence" as used in the above quoted statute have been defined by many of our prior decisions. For one of our latest, where such terms are considered, discussed and again defined, see *Swinney v. Ward,* 187 Kan. 746, 360 P. 2d 193, where, after citing numerous other decisions to the same effect at page 752 of the opinion, it is held:

"Former decisions of this court have interpreted the phrase 'gross and wanton negligence,' as it appears in G. S. 1949, 8-122b, to mean wanton conduct and wanton conduct is something more than ordinary negligence and yet is something less than willful injury. The act in question must indicate a realization of the imminence of danger and a reckless disregard and complete indifference to the probable consequence of the act." (Syl. ¶ 1.)

After carefully reviewing the evidence of record, pertinent portions of which have been heretofore set forth in the opinion at length so that there may be no question regarding its import, we are convinced this is a case where the existing facts disclose that speed, and speed alone, is the only negligent action on the part of defendant upon which plaintiff can rely as constituting "gross and wanton negligence," within the meaning of those terms as used in the guest statute (8-122b) and as construed in *Swinney v. Ward,* supra, and the decisions there cited. Therefore, since this court in numerous decisions, all dealing with such statute and particularly what constitutes wantonness, under its terms, on the part of a motor vehicle operator, has repeatedly held (see *Tuminello v. Lawson,* 186 Kan. 721, 723, 352 P. 2d 1057; *Perry v. Schmitt,* 184 Kan. 758, Syl. ¶ 4, 763, 339 P. 2d 36; *Hickert v. Wright,* 182 Kan. 100, 105, 319 P. 2d 152; *Long v. Foley,* 180 Kan. 83, 91, 92, 299 P. 2d 63; *Mason v. Banta,* 166 Kan. 445, 201 P. 2d 645; *Srajer v. Schwartzman,* 164 Kan. 241, 251, 188 P. 2d 971; *Anderson v. Anderson,* 142 Kan. 463, 466, 50 P. 2d 995; *Aduddell v. Brighton,* 141 Kan. 617, 618, 620, 42 P. 2d 555; *Murrell v. Janders,* 141 Kan. 906, 908, 44 P. 2d 218) that evidence of speed alone does not constitute "gross and wanton negligence," we are impelled to hold the evidence of record

fails to satisfy the standard required to prove defendant was guilty of gross and wanton negligence, wantonness, or wanton conduct; hence the trial court did not err in sustaining defendant's motion for a directed verdict at the close of plaintiff's evidence.

In reaching the conclusion just announced we have rejected, not overlooked, plaintiff's argument that information acquired·by defendant, which we pause to note was common to all occupants of the automobile, regarding the highways in question, coupled with his negligent speed, would make him guilty of gross and wanton conduct. Under the confronting circumstances we are convinced this argument lacks merit and cannot be upheld. This, we believe, is especially true in a case where—as here—all occupants of the automobile, including plaintiff, admitted in substance that they were in no way worried or disturbed about the manner in which defendant was driving; that they all felt safe up to the time the car started to skid; and that during the entire trip no occupant of the automobile ever made any protest or remonstrated with defendant about the manner in which he was driving. Certainly, under these circumstances, it cannot be successfully argued that, from the standpoint of wantonness, defendant can be charged with any greater realization of the imminence of danger than his friends who, as we have previously indicated, felt perfectly safe until the accident occurred.

Nor have we disregarded decisions cited by plaintiff where questions of speed and other facts were involved and held to be sufficient to establish gross and wanton negligence. Without citation or further reference thereto it suffices to say all such decisions have been carefully examined and, on the basis of the facts and circumstances there involved, must be regarded as clearly distinguishable.

We find nothing in the record to warrant or permit a reversal of the trial court's action in sustaining defendant's demurrer to plaintiff's evidence and thereafter rendering judgment against the plaintiff. Therefore such order and judgment must be affirmed.

It is so ordered.